NO. 5-08-0615

NOTICE

Decision filed 01/13/11, corrected 02/10/11. The text of this decision may be changed or corrected prior to the filing of a Petition for Rehearing or the disposition of the same.

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

_____

| | | |
|---|---|---|
| JAMES WISNIEWSKI, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 02-L-715 |
| | ) | |
| DIOCESE OF BELLEVILLE, | ) | Honorable |
| | ) | Lloyd A. Cueto, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE STEWART delivered the judgment of the court, with opinion.
Justice Welch concurred in the judgment and opinion.
Justice Spomer dissented.

**O P I N I O N**

On October 24, 2002, the plaintiff, James Wisniewski, filed a complaint against the defendant, the Catholic Diocese of Belleville (the Diocese), alleging that a priest within the Diocese, Raymond F. Kownacki, sexually abused him numerous times between 1973 and 1978. Wisniewski asserted claims against the Diocese for negligence, wilful and wanton conduct, fraud and deceit, and civil conspiracy. Wisniewski alleged that the Diocese knew that Kownacki had molested other children at other parishes before transferring him to St. Theresa's school and church in Salem, Illinois. On August 27, 2008, a jury awarded Wisniewski $2.4 million in compensatory damages and $2.6 million in punitive damages, and the circuit court entered a judgment upon the jury's verdict. The Diocese timely filed a notice of appeal of the circuit court's judgment. On appeal, the Diocese argues the following: (I) that Wisniewski's claims were barred by the applicable statute of limitations and statute of repose, (II) that Wisniewski's claims were insufficient as a matter of law, (III) that the

1

circuit court abused its discretion in denying the Diocese's motion for a mental examination of Wisniewski under Illinois Supreme Court Rule 215 (eff. July 1, 2002), and (IV) that the circuit court abused its discretion in striking certain references from the records and testimony of one of Wisniewski's witnesses.  The Diocese does not claim that the verdict is excessive.  For the following reasons, we affirm.

BACKGROUND

The Diocese is a religious not-for-profit corporation that ministers to more than 100,000 Catholics in the southernmost 28 counties of the State of Illinois.  The Diocese includes approximately 116 parishes, 26 or 27 Catholic grade schools, and 3 high schools, and it employs approximately 140 priests.  The Diocese has four officers: the bishop serves as the president or CEO of the not-for-profit corporation, the vicar general serves as the vice president, the chancellor serves as the secretary, and the chief financial officer serves as the treasurer.  The vicar general is second in the Diocese's chain of command and serves as the alter ego of the bishop in the administrative affairs of the Diocese.  The chancellor of the Diocese is responsible for keeping the archives, records, and official Diocese files, including personnel files.  The Diocese also employs a vice-chancellor, who works as an archivist and an ecclesiastical notary but is not an officer of the not-for-profit corporation.  The Diocese employs a secretary for the bishop, whose duties include keeping track of the bishop's appointments, typing letters for the bishop, serving as the bishop's driver, and visiting the various parishes in the Diocese with the bishop.  The bishop, the bishop's secretary, the vicar general, the chancellor, and the vice-chancellor all work together in a building called the chancery, which is located in Belleville, Illinois.

At the trial, Wisniewski presented evidence that, when he was a young boy growing up in Salem, Illinois, he and his family were parishioners of St. Theresa's parish located in Salem.  Beginning in 1973, when he was 12 years old, Wisniewski endured repeated

2

incidents of sexual molestation by a priest employed by the Diocese. The molestation occurred over a number of years. The priest was Raymond F. Kownacki, and at the trial, the Diocese did not deny that Kownacki committed the acts of sexual abuse described by Wisniewski. Wisniewski's claim against the Diocese is based on the assertion that the Diocese was responsible for the molestation he endured because the Diocese knew that Kownacki had molested other children at other parishes before it transferred Kownacki to St. Theresa's parish in Salem. An analysis of Wisniewski's claim against the Diocese requires a consideration of events that occurred while Kownacki was in Salem and a consideration of events that occurred during the years before and after Kownacki came to Salem. We review the facts presented at the trial in the light most favorable to the prevailing party. *Quality Granite Construction Co. v. Hurst-Rosche Engineers, Inc.*, 261 Ill. App. 3d 21, 24, 632 N.E.2d 1139, 1141 (1994).

I.

The Diocese's Knowledge of Kownacki's History of Child Sexual Abuse

Kownacki was born December 8, 1934, and he was first ordained as a priest in the Catholic Church on June 4, 1960. Kownacki served the Catholic Church at various locations after he was ordained, including O'Fallon and East St. Louis, Illinois, and Guatemala. The record contains little information concerning the earliest years of Kownacki's ministry. On December 9, 1970, the Diocese appointed Kownacki as the priest of a parish in the small town of St. Francisville, Illinois. At St. Francisville, Kownacki met a young girl at the parish named Gina Parks. On June 8, 1971, the Diocese transferred Kownacki to St. Martin of Tours parish in Washington Park, Illinois.

Sometime in 1973, the Diocese became aware of allegations that Kownacki had sexually abused Gina. At that time, the bishop of the Diocese was Albert R. Zuroweste and the Diocese's chancellor was Monsignor Bernard Sullivan. Sullivan, the Diocese's records

keeper, had the habit of taking extensive notes of each of his telephone conversations and meetings. On April 24, 1973, Bishop Zuroweste, Chancellor Sullivan, and another priest, Dean Braun, met with Gina Parks and her family at the chancery to discuss abuse Kownacki perpetrated against Gina. As was his custom, Sullivan took extensive handwritten notes during that meeting, and he transcribed his handwritten notes three days later.

The first two paragraphs of Sullivan's April 27, 1973, typed notes detailed allegations of sexual abuse and misconduct involving Kownacki that the Diocese had previously received notice of and that were in addition to the abuse reported by Gina and her parents on April 24, 1973. Sullivan's notes began as follows:

"Last year complaint from man in Guatemala that you [Kownacki] were sleeping with his daughter and she was pregnant by you. We accepted explanation that this man was jealous and was trying to make you the scape goat.

Last month a priest came to us and said the parents of a 14 year old girl complained to him that you were molesting their daughter. We instructed the priest to have the parents go to you and complain, and if they could not obtain satisfaction then they should come to the Chancery."

Sullivan's typed notes then continued with a detailed description of Gina and her parents' complaint of sexual abuse committed by Kownacki. The notes stated that Gina and her family came to the chancery on April 24, 1973, to inform the officers of the Diocese about Kownacki's repeated molestation of and violence toward Gina, a minor.

According to Sullivan's notes, Gina, a 16-year-old girl, attended religious instruction classes taught by Kownacki in St. Francisville. In addition, Gina cleaned the rectory for Kownacki in St. Francisville. At the April 24, 1973, meeting, Gina described an occasion when Kownacki took her to his mother's house in Tamaroa, Illinois, to clean. Sullivan's notes of the meeting quoted Gina as follows: " 'Then that night we stayed in his Mother's

home, and I went to bed and the next thing I knew Father was in bed with me and we had intercourse.' " At the meeting, Gina also described another incident when Kownacki came into the bathroom as she cleaned, closed the door, and started kissing her.

Gina told the officers of the Diocese that Kownacki told her that he had money and could send her to school to study art. When Kownacki was assigned to the parish in Washington Park, Illinois, he convinced Gina's parents to allow her to go to Washington Park with him. Kownacki told her parents that he would send Gina to school and would pay her $200 per month to be his housekeeper. Gina told the Diocese's bishop and chancellor about incidents of physical and sexual abuse she endured at the hands of Kownacki after they moved to Washington Park. The abuse continued regularly for nearly two years. Kownacki gave her alcohol and assured her that the sexual abuse was a good thing because God wanted people to love each other. The last incident occurred in March of 1973. At Washington Park, Gina eventually started dating a classmate, Carlos, and Kownacki became jealous of that relationship. At one point, Kownacki slapped Gina, called her a whore and a slut, and told her she was wrong in sharing her body with Carlos.

Kownacki told Gina about his housekeeper in Guatemala with whom he had sexual relations, and he boasted about many other girls who came to him in Guatemala "just for the pleasure of sex." Kownacki told Gina that his housekeeper in Guatemala became pregnant. He told Gina that he was not the father of the housekeeper's child because he was sterile but that he came back to the United States to get away from her. At some point, Sullivan's notes continue, Gina also became pregnant. Kownacki reported to Gina that his doctor had now told him that he was not sterile. Gina did not know if her child's father was Kownacki or her boyfriend. Kownacki told Gina that if she did not want the baby, she could have an abortion. He gave Gina a drink on two different days for the purpose of aborting the baby. Kownacki also told Gina that if the drinks did not work, he could "squeeze it out." Gina told the

5

Diocese's bishop and chancellor that Kownacki put his fingers inside her, against her will, and tried to abort the baby, which caused her pain and a cervical infection.

At the meeting, Gina also reported to the Diocese that a pair of twin boys from Guatemala lived with Kownacki while he was assigned to the parish in Washington Park. According to Sullivan's notes, Gina reported that one of the twins engaged in "homosexuality" with Kownacki. Gina also reported the name of another 14-year-old girl at the St. Martin of Tours parish in Washington Park whom she believed Kownacki was also involved with. Sullivan's notes identified the girl by name. His notes indicated that Kownacki told Gina that he went to confession every week or so and that the bishop knew what he was doing. At the conclusion of their meeting with Gina and her family, the bishop and the chancellor determined that they needed to speak with Kownacki.

On April 26, 1973, Kownacki wrote Gina a letter, in which he said, among other things, "[D]espite scandal, reputation to me as a priest, *** I will always see that you are through this little crisis." He told her that he was really concerned and cared about her and always would. He hoped that she was feeling much better and that she was happy. He told her that she had been the best part of his life in Washington Park and in St. Francisville. The next day, April 27, 1973, the bishop and the chancellor met with Kownacki at the chancery to discuss Gina's allegations. At the end of his typewritten notes, Sullivan made a note of their meeting with Kownacki and further wrote as follows: "We told him the whole story without the details. We said he needs help."

After his meeting at the chancery, Kownacki wrote a second letter to Gina. In a letter dated May 2, 1973, he wrote to Gina as follows: "Guess it's time to say 'adios' to a great little girl who will always be remembered as the best girl I knew and hoping I'm cured of my problem[;] you'll always be in my mind." He wrote that it took "shock from all sides" to make him realize that he needed help. He wrote that he would suffer "like Cain" in the

6

future when people point a finger at him and say that he is an alcoholic and "a real mental case." He told Gina, "[The] parishioners know only that I'm going away for a rest because of a possible nervous breakdown (which is literally true, too!)." He wrote, "Blot out from your memory the past two years and if you cannot, then all I ask is. . . . forgive me!" He told Gina that she could get his address but that he presumed she still thought of him as "that monster" who ruined her future.

At some point, the Diocese obtained copies of Kownacki's letters to Gina. The record does not indicate how or when the Diocese obtained copies of the letters, but the record discloses that it had copies of Kownacki's letters as early as 1984. The Diocese's copies of Kownacki's letters to Gina were placed in his personnel file, but Sullivan's handwritten and transcribed notes were not. Instead, the Diocese kept Sullivan's notes in a separate location that was undisclosed in the record.

Prior to the 1990s, the Diocese did not have any specific policies or rules with respect to handling allegations of child sexual abuse by priests. The Catholic Church's code of canon law, however, set out certain standards and rules that the Diocese was required to follow. The code of canon law required the bishop, or someone he delegated, to investigate allegations of sexual abuse or misconduct that were brought against any priest within the Diocese, and if the investigation showed the probability that something had happened, then a judicial trial was to be held. The Diocese, however, did not conduct any trial with respect to Gina's allegations of abuse.

Instead, approximately 1½ months after Gina reported Kownacki to the Diocese, Bishop Zuroweste asked Kownacki to resign as the pastor of St. Martin of Tours. Kownacki subsequently resigned from the parish effective June 28, 1973. The Diocese did not investigate the allegations of sexual misconduct by Kownacki while he was in Guatemala or the allegations of sexual misconduct involving the twin boys from Guatemala or the 14-year-

7

old girl at St. Martin of Tours whom Gina had identified by name. In addition, the Diocese never disclosed the allegations of sexual abuse to any authorities or to any of the parishioners of St. Martin of Tours in Washington Park or the parishioners in St. Francisville. No one from the Diocese reached out to Gina to offer her any assistance in dealing with Kownacki's abuse. Less than four months after removing Kownacki from the parish in Washington Park, the Diocese appointed Kownacki to St. Theresa's parish in Salem, Illinois.

II.

Wisniewski's Childhood Before and After Meeting Kownacki

Wisniewski was born in 1961 in Wisconsin, and he was the second youngest child in a family of five children. At the time of the trial, he was 47 years old. Both of Wisniewski's parents, Mel and Marcy, were raised in devout Catholic families in Wisconsin. Mel and Marcy attended Catholic grade schools and high schools in Wisconsin, went to church every week, and raised their children in the same Catholic traditions and environment. They took their children to church every Sunday, and they raised Wisniewski and his siblings to respect the priests of the church, to believe that they spoke God's word, and to be actively involved in church life. Mel testified that Catholic priests, monsignors, and bishops were put on a pedestal in his family. Mel raised his family to do whatever the agents of the church said and to never question them.

Mel and Marcy moved their family from Wisconsin to rural Salem, Illinois, in 1964, when Wisniewski was three years old. They moved to Salem so Mel could open a retail music store. The only Catholic church in Salem, Illinois, was St. Theresa's Catholic Church. Before moving their family to Salem, Mel and Marcy visited the church to meet the priest who was serving the church at that time. They joined St. Theresa's before moving their family to Salem, and they have been members of that church ever since.

After moving to Salem, Wisniewski and his brother and sisters became active in

8

Catholic church life at St. Theresa's parish. They attended the Catholic grade school in Salem before it closed, they received religious instructions and training at the church, and the bishop of the Diocese confirmed them into the faith. They attended mass every Sunday and sometimes during the week. Wisniewski's father served as a commentator during mass at times. Wisniewski testified that he grew up to love the church and its teachings and to believe in the church. From a very young age, he was taught to respect the priests, to believe what they said was true, and to obey them.

Wisniewski and his parents described Salem in the 1970s as a small, friendly community, where everyone knew one another. The parents in Salem looked out for one another's children, and the children rode their bicycles around the town without any concern from the parents. As a boy, Wisniewski was quiet and obedient. He did what he was told to do and never got into trouble. In 1973, he turned 12 years old and enjoyed a healthy and happy childhood. The course of Wisniewski's life, however, was forever altered on November 8, 1973, when the Diocese appointed Raymond F. Kownacki as the priest at St. Theresa's in Salem.

On October 26, 1973, the bishop sent a letter to Kownacki informing him of his appointment as the pastor of St. Theresa's parish in Salem, Illinois, effective November 8, 1973. Speaking on behalf of the Diocese, the bishop told Kownacki that they were confident that he would find the people of the parish "responsive to [Kownacki's] pastoral zeal." In addition, the bishop expressed appreciation to Kownacki for his "help in solving the problems in Guatemala."

The Diocese prepared an official appointment of Kownacki as the parish priest that was addressed to Kownacki. The official appointment sent to Kownacki, or a similar document addressed to the parish, would have been read to the parishioners of St. Theresa's parish. The bishop's official appointment stated that he had confidence in Kownacki's

9

knowledge, piety, prudence, experience, and general character. The Diocese's official appointment "command[ed] all, whom it may concern, to recognize [Kownacki] as such Pastor and grant [him] all necessary assistance." No one from the Diocese informed the parishioners of St. Theresa's about Kownacki's past violence, sexual abuse, or sexual misconduct. At the trial, the Diocese's official corporate representative, Monsignor James Margason, testified that by appointing Kownacki as the parish priest, the Diocese held Kownacki out as being safe and suitable to minister to the parishioners and have unsupervised contact with the parishioners' children. No one from the Diocese restricted or supervised Kownacki's contact with the minor children of St. Theresa's. Since Mel and Marcy had no reason to distrust Kownacki, they put their full faith and trust in him to minister to their children.

Shortly after he came to St. Theresa's, Kownacki met Wisniewski and began giving him special attention. Wisniewski took over the duties of taking care of the grounds around the church and around the priest's residence, the rectory. With Marcy's encouragement, Wisniewski also became an altar boy shortly after Kownacki arrived. Wisniewski started spending more time around the church than with his friends, and Mel and Marcy thought that was good because Wisniewski was helping the church. Mel's retail music business required him to work long hours; so he and Marcy were pleased that their trusted priest had developed a special interest in their youngest son. Neither Mel nor Marcy had any reservations about Wisniewski working for Kownacki, because he was a priest.

At the trial, Wisniewski testified that he initially considered Kownacki a friend and someone to look up to. Kownacki related well to the children of the parish and was fun to be around. Wisniewski was interested in photography, and Kownacki purchased cameras and set up a darkroom in the church basement. Kownacki encouraged Wisniewski to take pictures around the parish community and at parish activities to be included in a parish

newsletter and bulletin that Kownacki had planned. Wisniewski became interested in and talked to Kownacki about the priesthood and the functions of a priest. With the Diocese's endorsement, Kownacki had the complete trust and confidence of St. Theresa's parishioners, including Wisniewski and his parents.

A few months after getting to know Wisniewski, Kownacki asked him and another boy to spend the night with him at the rectory. That night, Wisniewski and the other boy watched movies with Kownacki. Kownacki plied them with alcohol. Wisniewski testified that it was hard alcohol of some type and that he had never had alcohol prior to that evening. As the evening progressed, the other boy became sleepy, and he retired to a spare bedroom in the rectory. Unfortunately, Wisniewski stayed awake watching television with Kownacki. Kownacki moved over to Wisniewski and started rubbing the 12-year-old's shoulders and kissing his neck. Kownacki's hand moved down and rubbed Wisniewski's genitalia. Wisniewski had not been previously exposed to any kind of sexual encounter or education, and he was taught to obey and trust priests. He was confused. Kownacki led Wisniewski into his bedroom, took off Wisniewski's clothes, and took off his own clothes. Kownacki performed oral sex on Wisniewski while he masturbated himself. After the molestation, Kownacki fell asleep. Wisniewski got up, washed himself, and went back into the other room. Wisniewski did not say anything to his parents or anyone else the next day because he was afraid he would get in trouble.

Wisniewski testified that additional incidents of sexual abuse continued after that evening on a continual basis for several years. The next incident of abuse occurred shortly after the first one, and the sexual abuse became "very routine." The abuse consisted of mainly oral sex that occurred in the rectory, in the school, in the church, and in the darkroom that Kownacki had built for Wisniewski. Kownacki eventually told the other boys who also worked around the church that they were no longer needed, so that he could be alone with

11

Wisniewski. Kownacki took Wisniewski on trips to St. Louis, Chicago, Washington, D.C., Guatemala, and Rome. Wisniewski testified that Kownacki sexually molested him on some overnight trips.

At the trial, Wisniewski did not remember the exact number of times he was molested by Kownacki, but he remembered it being more than 50 times. At first the abuse occurred on a weekly basis, but as the years went by and as Wisniewski became an older adolescent, the abuse tapered off and eventually ended by the time he was a sophomore or junior in high school.

A psychiatrist, Dr. Stephen Peterson, testified that Kownacki utilized two coercive tactics to keep Wisniewski silent about and submissive to the abuse: positive coercion and negative coercion. At first, Kownacki used positive coercion by giving Wisniewski special attention in order to set him up for easy manipulation. In addition, Kownacki's positive coercive tactics included telling Wisniewski that the sexual molestation was okay, that the Church condoned that sort of thing, and that there were other priests in the Diocese who did the same thing. Kownacki also used positive coercion by telling Wisniewski that the abuse was his way of relieving his stress. He also told Wisniewski that it proved that he was growing up and that it was good for him. Wisniewski testified that since he was taught to obey and believe the priest, he trusted Kownacki. He believed that what he was doing was okay because of what Kownacki told him. Peterson testified that Kownacki overwhelmed Wisniewski and programmed him to accept the behavior as good.

However, there were times during the abuse that Wisniewski felt guilty about what was happening to him, and Kownacki could sense Wisniewski's reluctance at these times. Kownacki then utilized what Peterson described as negative coercive tactics. At times when Wisniewski resisted Kownacki's molestation, Kownacki threatened to tell everyone that Wisniewski was gay, to ruin Wisniewski's parents' business, and to force his family to move

12

out of town. Kownacki kept a box next to his bed that contained a handgun, and there were times when Kownacki made threats to use the gun if Wisniewski ever told anyone about what was happening between them. One time Kownacki threatened to kill Wisniewski's parents, and another time he threatened to kill himself. Kownacki's threats scared Wisniewski, and he took them seriously. In addition, Wisniewski did not want his friends or anyone else to know what was happening, and he was afraid of people finding out if he said anything. Wisniewski testified that many times Kownacki was drunk when he made the threats and that Kownacki was mean when he was drunk.

Wisniewski testified that he continued to work around the parish grounds and agreed to go on trips with Kownacki because Kownacki had befriended him and, at the same time, he was afraid of Kownacki's threats. He did not know what Kownacki was capable of, and in addition, he was still trusting, believing, and putting his faith in the Catholic priest.

Mel and Marcy had completely trusted Kownacki with their son and had no reservations about Wisniewski being around him. They testified that, had the Diocese told them that Kownacki had sexually molested other children in the past, they would not have allowed Wisniewski or any of their other children to be around him. However, no one from the Diocese told them anything about Kownacki's past. Instead, the bishop publicly gave Kownacki his full confidence, vouched for his suitability to serve as the parish priest, and held him out as suitable to minister to and have unsupervised contact with the parish children.

Wisniewski graduated from high school in 1980, moved to Champaign, Illinois, and enrolled in Parkland College. At that point, Wisniewski wanted to move on with his life, and he successfully mastered the ability to put Kownacki's molestation out of his mind. Although he never totally forgot about the abuse, he became successful in blocking it out of his mind. He did not let the abuse impact his daily activities or his psychological health. Wisniewski

13

felt comfort in believing that he was Kownacki's only victim. Kownacki had told him that he was the only one, and Wisniewski believed what Kownacki said. In addition, Wisniewski had no reason to believe that the Diocese had any knowledge relevant to Kownacki's dangerous propensities. For a few years after Wisniewski moved away from Salem, Kownacki continued to serve as the priest at St. Theresa's. Kownacki performed the marriages of Wisniewski's brother and two of his sisters. Kownacki visited Wisniewski on a few occasions in Champaign, and he agreed to visit with Kownacki because he was afraid of the ramifications of telling him no.

III.

Additional Acts of Child Sexual Abuse and the Diocese's Silence and Concealment

Meanwhile, Kownacki's sexual molestation and misconduct continued within the Diocese after Wisniewski left Salem, and the officers of the Diocese were aware of his continuing misconduct and abuse. In 1982, someone within the Diocese prepared a confidential report that detailed new allegations of sexual molestation by Kownacki. The report was not signed, and the evidence presented at the trial did not establish who authored the report. The evidence did establish, however, that the report was prepared by someone within the Diocese. The Diocese did not keep the report in Kownacki's personnel file but kept it in an undisclosed location in the chancery.

The 1982 report described information that the Diocese had received from the parents of a high school freshman boy at St. Theresa's parish in Salem. The parents reported an incident involving Kownacki and their son. The freshman boy had been mowing Kownacki's grass, and Kownacki called him on a Saturday and asked him to stay overnight. The freshman boy went jogging or had a track meet, and when he returned to the rectory, Kownacki told him to take a shower and that he would give him a massage. The report stated as follows: "This is when everything happened: fondling, kissing etc. [The boy]

14

wanted to go home but [Kownacki] made him stay all night."

The Diocese's report also stated that Kownacki told the boy about two other parish boys whom he had also been involved with at one time. The report stated, "One is Jim Wisniewski (spelling?)." The boy did not remember the other victim's name. According to the report, Kownacki told the freshman about the other boys because the boy was upset by what Kownacki was trying to do to him. Kownacki told him, "This is okay; I've done it before." He told him that it was "a sign of friendship" and made him promise not to tell his parents.

The 1982 report stated that the mother of the freshman boy also reported to the Diocese that there was "an element of fear in her family" because she and her husband were concerned that Kownacki "might become vicious" after he found out she had reported him. They were keeping their doors locked and were careful where their children went. The unknown author of the 1982 confidential Diocese report concluded that Kownacki was "sick." The Diocese representative who prepared the report assured the parents that something would be done. The report indicates that the parents responded that if something was not done, they would file a lawsuit because they did not want the same thing to happen to any other parish boys.

In 1982, Joseph Schwaegel served as the secretary to the bishop as well as the vice-chancellor of the Diocese. Schwaegel testified that, after the parents of the freshman boy complained to the Diocese that Kownacki had sexually molested their son, he had at least one conversation with the parents and asked them to keep quiet about what had happened. Schwaegel testified that the Diocese did not want to "go hanging the dirty laundry all over the line." Therefore, he told the parents not to let "this get out all over the parish." He told them, "Let's just keep it quiet and try to get this resolved in whatever manner the Diocese will decide how to resolve this."

15

Schwaegel testified that, because of what the parents reported, he became aware that Wisniewski might have been a victim of sexual abuse committed by Kownacki. However, he did not make any attempt to contact Wisniewski or his parents. In addition, no one else from the Diocese contacted Wisniewski or his parents upon learning that Wisniewski had been molested by Kownacki. At the trial, Schwaegel was asked: "This boy [Wisniewski] was forgotten. He was written off as dirty laundry, wasn't he?" Schwaegel answered, "Yes."

Although he was aware of the 1982 confidential memo at the time it was prepared, at the trial, Schwaegel denied ever seeing Sullivan's 1973 notes that detailed Kownacki's child sexual abuse of Gina. He testified that he was not working at the chancery when Sullivan created those notes and that there had been no need for Sullivan to share that information with him after he arrived at the chancery in late June of 1973.

After the parents reported Kownacki's abuse of their freshman son, the Diocese removed Kownacki as the parish priest at St. Theresa's in Salem and immediately reassigned him as the pastor of St. Joseph's parish in Cobden, Illinois, effective July 6, 1982. At this time, the bishop of the Diocese was John N. Wurm. On June 8, 1982, Bishop Wurm sent Kownacki a letter informing him that his new appointment was in view of his "dedicated priestly services" to the local church of Belleville. The bishop stated in his letter, "I heartily commend you to all the people of your parish." When he was transferred to Cobden, Kownacki did not receive a pay cut, a demotion, a demerit, or any mark on his record.

When the Diocese removed Kownacki as the parish priest at St. Theresa's, it did not inform the parishioners that it had removed him because of allegations of sexual abuse. Although Bishop Wurm and other officers at the chancery were aware of the contents of the confidential 1982 report, the Diocese did not inform anyone at the parishes in Salem or in Cobden about the allegations brought by the mother of the freshman boy or about the allegation that Kownacki had molested Wisniewski and another boy at the parish. In

16

addition, the Diocese did not tell any parishioners about prior allegations that Kownacki had committed sexual abuse and misconduct in Guatemala, with the twin boys he brought back from Guatemala, with Gina Parks, or with the 14-year-old girl at St. Martin of Tours. Instead, the Diocese held Kownacki out as an appropriate priest to minister to the parishioners in Cobden and to have unsupervised contact with the parishioners' minor children. Schwaegel testified that when Kownacki was transferred to Cobden, everyone at the chancery knew that Kownacki was sick and liked to molest children. However, the Diocese did not provide any special supervision over Kownacki after he was transferred to Cobden.

On June 21, 1982, the local newspaper in Salem printed an article about Kownacki's transfer to Cobden. The article reported that Kownacki was leaving St. Theresa's parish because he had asked the bishop for an assignment in Cobden to "work with the Hispanic community in the Cobden area." Kownacki was quoted in the article as follows: " 'I find this assignment just another deep challenge of ministry ***. *** I have always loved the Spanish culture and even though I consider myself a "liberal-conservative," I think I can be of help to the People of God of the Cobden area. Otherwise I would not have asked for a change in ministry.' "

The parents of the freshman boy at St. Theresa's who had reported Kownacki to the Diocese were not happy with the contents of the newspaper article, and they wrote a letter addressed to Vice-Chancellor Schwaegel to express their displeasure. The parents stated in their letter that it had been a difficult time for their family and that they knew that the way that the bishop handled "the situation" was best for the parish and the "Catholic church as a whole." However, the parents included a copy of the article with their letter and stated, "Here is a man, a priest who committed a very serious sin and instead of being sorry and leaving quietly, he pads it by lying." The letter stated that the family had done as they were

17

asked and had not "said anything to anybody."

Schwaegel responded to the parents in a letter dated June 25, 1982. Schwaegel told the family in his letter that he could understand their "difficulty in accepting the manner in which [Kownacki] describe[d] his termination at Salem and new assignment in Cobden." Schwaegel continued, "Since you have been so kind in the manner in which you handled this situation, I am giving [Kownacki] the benefit of the doubt and praying that he truly desires to make a fresh start." After telling the family that it was difficult to let "bygones be bygones," he stated that he was sorry that Kownacki had to learn his lesson at the expense of their family.

At the trial, Schwaegel admitted that he gave Kownacki the benefit of the doubt without ever interviewing him. He testified that he relied on others inside the chancery for advice and that it was not his decision alone. In addition, he admitted that Kownacki had not learned any lesson as his letter falsely stated. Instead, the Diocese simply reassigned him to another parish, did not discipline him, and did not even give him a written warning.

For reasons undisclosed in the record, Kownacki was a priest in Cobden for less than a year before the Diocese transferred him to St. Mary's parish in Harrisburg, Illinois. In a letter dated June 13, 1983, Bishop Wurm notified Kownacki that, in view of his "dedicated priestly service," he had been appointed the pastor of St. Mary's parish in Harrisburg and that he heartily commended him to all the people of that parish. Again, the Diocese did not inform the parishioners in Harrisburg about the previous allegations that Kownacki had sexually molested children and engaged in sexual misconduct.

On August 9, 1984, Schwaegel received a telephone call from another priest of the Diocese, Don Abell, who reported problems that the Harrisburg parish was having with Kownacki. Abell reported to Schwaegel that the trustees of the Harrisburg parish were irate over some recent incidents. Kownacki had two boys living in the rectory, and one of them

had walked through a plate glass door. Abell told Schwaegel that a doctor had "fixed the kid up" and no one would "say how it happened." Abell reported that Kownacki was paying the two boys $150 per week but that they did "absolutely nothing." According to Abell, the janitor at the church also reported that many times when he arrived at the rectory in the morning, as many as five or six boys left the rectory, and the janitor presumed that they had been there all night. Abell told Schwaegel that Kownacki had "to be removed immediately or there [would] be nothing left of the Harrisburg parish."

Bishop Wurm passed away in April of 1984, and the Diocese was between bishops at the time Abell made the telephone call to Schwaegel. Therefore, Schwaegel drafted a memo to Monsignor James Margason, passing on Abell's information. Margason had been serving as the Diocese's vicar general since October of 1983, and when Bishop Wurm passed away, he was appointed as the administrator of the Diocese until the appointment of a new bishop. In addition, in the 1970s, Margason had obtained a law degree in Rome on the Catholic Church's code of canon law. Schwaegel's memo to Margason concluded with, "good luck, Joe." Schwaegel testified that in signing, "good luck," he meant, "here we go again with Kownacki, so good luck with this one."

Because Schwaegel's memo stated that young boys were living in the rectory, one of Margason's concerns was the possibility of improper sexual activity between Kownacki and the boys. Margason began his investigation by speaking with Chancellor Sullivan at the chancery and asking him if he had any information about allegations of sexual abuse or misconduct involving Kownacki that were not included in Kownacki's personnel file. Sullivan then gave Margason copies of his notes from the meeting with Gina and her family that had occurred back on April 24, 1973. Margason testified that he had not seen Sullivan's notes prior to investigating Kownacki in Harrisburg.

Margason went to Harrisburg and met with the trustees of the Harrisburg parish.

19

During the meeting, the trustees raised their concerns with Kownacki, including that young boys were living in the rectory, that the boys seemed to do nothing but were being paid, that Kownacki was drinking heavily, and that he had purchased a car in the parish's name. The trustees were concerned because the parish was located in an area that was primarily non-Catholic, and they were concerned that their reputations were being damaged by Kownacki's activities.

Margason also talked to the church's janitor, to Kownacki, and to the two boys who were living in the rectory with Kownacki. He testified that the boys could have been minors, but he was not sure. The two boys admitted that they had been staying at the rectory and had been drinking with Kownacki. They denied any sexual activity. One of the boys stated that he had an interest in becoming a priest. Kownacki and the boys denied that any other boys stayed at the rectory. At the trial, Margason testified that since Kownacki and the boys denied any sexual activity, he had to take their word. However, he did not try to contact the boys' parents.

Margason testified that having two boys living in the rectory was inappropriate and against the Diocesan statutes. Therefore, Margason told Kownacki and the boys that they all had to leave immediately. He offered Kownacki medical help; Kownacki accepted and returned to Belleville. Margason testified that Kownacki was removed from the Harrisburg parish because he was drinking, was misusing parish funds, and had people staying in the rectory who should not have been there.

Margason stayed at the parish in Harrisburg that weekend and performed the parish services, a funeral, and a wake service. When Margason spoke with the Harrisburg parishioners, he told them that Kownacki had some problems and that he hoped the Diocese could get him the help he needed. Margason did not specifically tell the parishioners what kinds of problem Kownacki had or what kind of help he needed. He told the parishioners

that it was time for a new beginning and that what had happened in the past was the past. Margason knew that there were stories circulating about Kownacki in the community. He told the parishioners that there was no point in saying "this is what I heard happened" or in repeating stories. Margason emphasized to the parishioners that if there was the slightest doubt in their minds that something they heard was true, then in justice they should not repeat it.

On September 10, 1984, Sullivan sent Kownacki a form for him to sign as his resignation as the pastor of St. Mary's church in Harrisburg, effective August 17, 1984. The document stated that the resignation was due to an illness which prevented him from satisfactorily performing his pastoral duties. Kownacki was placed on sick leave and was assigned to the Hincke House[1] as his residence and for treatment. At that time, he was not assigned to another parish.

On December 11, 1984, James P. Keleher was ordained as the Diocese's bishop, and Margason continued to serve as the vicar general under Bishop Keleher. In the late 1970s, the Diocese had established a personnel board that advised the bishop concerning appointments of priests to various parishes and offices in the Diocese. The personnel board members included the bishop, the vicar general, the chancellor, the vice-chancellor, and the secretary to the bishop. After the Diocese removed Kownacki from the Harrisburg parish and admitted him into the Hincke House for treatment, he became the subject of conversation at subsequent meetings of the personnel board. At the time, the personnel board included Bishop Keleher, Margason, Schwaegel, and Sullivan, among others. Schwaegel also served as the secretary of the personnel board, taking notes and preparing minutes.

_____

[1]The record on appeal does not explain what type of facility the Hincke House is but indicates that the Diocese temporarily housed Kownacki at the Hincke House for treatment.

The personnel review board met on February 26, 1985, and the minutes of that meeting stated that Margason was to visit Kownacki the following day. Nothing in the record reflects the Diocese doing anything further with respect to Kownacki until the April 2, 1985, personnel meeting. The minutes of that meeting stated, "In making assignments, must not forget about Fr. Kownacki." The minutes of the May 9, 1985, meeting of the personnel board stated: "Fr. Kownacki is ready for a parish. Bishop informed him the Board is about ready to come up with a parish."

On May 15, 1985, Bishop Keleher sent Kownacki a letter informing him that he was appointed the pastor of St. Patrick's parish in Tipton, Illinois, and the Immaculate Conception parish in Madonnaville, Illinois. The bishop's letter stated that he was looking forward to Kownacki's graduation from St. Michael's on May 29, 1985, and that he was very pleased with the progress Kownacki made during his time at St. Michael's. Testimony at the trial established that St. Michael's is an alcohol treatment facility for priests.

The bishop told Kownacki in his letter: "[A]s you assume the pastoral responsibility of the parish communities at Tipton and Madonnaville, I am confident you will carry out your mission well in building up the Body of Christ at these two beautiful parishes. I will be also grateful for your strong support of Gibault High School." The bishop concluded his letter with a profession of support for Kownacki in his new position. The letter stated that the appointment was after consultation with and approval by the personnel board. In a letter dated June 25, 1985, the bishop informed Kownacki that he was also appointed the pastor of St. Mary's in Valmeyer, Illinois, after consultation with and approval of the personnel board. The bishop was confident that Kownacki would carry out his "mission well in building up the Body of Christ in these three beautiful parishes."

Again, the Diocese did not inform Kownacki's new parishioners of the past allegations of sexual abuse or misconduct. By appointing Kownacki to these parishes, the Diocese again

held him out as a safe and suitable priest to minister to the parishioners and have unsupervised contact with their children. This appointment included attending mass and performing services at Gibault Catholic High School.

Shortly after his new assignment, new allegations of impropriety arose involving Kownacki and young boys. In 1986, the rectory housekeeper at the Valmeyer parish met with Margason to talk about Kownacki and also sent Margason two letters about Kownacki. The housekeeper reported to Margason that there were young boys living in the rectory and that she had found a note in the rectory that was addressed to one of the boys. The note stated as follows: "Dear [redacted name of boy], come up to my bedroom if I am sleeping or not and massage me. I need it. I love you [redacted name of boy]. Ray." The housekeeper also told Margason that she had also found a Playboy magazine in the rectory and found a "sexy picture out of a magazine under his bed." She asked Margason to figure out what was "going on over there with those boys" and stated that "more and more people are going to Waterloo to mass because of [Kownacki] and what they hear." The housekeeper stated that there was "something the matter" with Kownacki and that something had to be done before he wrecked the whole parish.

Margason testified that the note that the housekeeper described was inappropriate for a priest to write to a young boy. Very soon after receiving this information, Margason went to Valmeyer to talk with the housekeeper, Kownacki, and the two young boys. Kownacki told Margason that there had not been any inappropriate activity with the boys but that he did not deny that the two young boys were spending time with him at the rectory. Margason did not know whether the boys were minors, and no one from the Diocese contacted their parents.

In March of 1987, Kownacki was no longer the priest in Tipton, but he was still the priest at Valmeyer and Madonnaville. The personnel board met on March 18, 1987, and the

meeting was attended by, among others, Bishop Keleher, Abell, Margason, Sullivan, and Schwaegel. The minutes of this meeting state as follows: "This led to much discussion on Fr. Kownacki. Bishop said while we must take care of a brother priest, the diocese must also be considered. Much discussion." On April 7, 1987, the personnel board met again, and the minutes stated that "nothing much ha[d] changed" with respect to Kownacki and that the board "agreed he should be moved from Valmeyer now." (Emphasis in original.) The board discussed placement options and concluded that placing Kownacki in a hospital chaplaincy ministry could be dangerous. They determined that he should be moved to the Hincke House again, but one member of the board, Father Eichenseer, was concerned that Kownacki would have a lot of free time to go wherever he wanted and questioned how he would be supervised and who would do the supervising. Sullivan stressed that Kownacki must be active and not just sit around.

The record indicates that the Diocese subsequently removed Kownacki from his parishes and assigned him to Poor Clares, which is a cloistered convent for nuns and where there were no children. Margason testified that the Diocese removed Kownacki from his parishes because he was drinking again and having people living in the rectory who did not belong there. The Diocese again did not provide Kownacki's parishioners with any information concerning the reasons for his reassignment.

In a letter dated June 22, 1988, Bishop Keleher informed Kownacki that he had been appointed to residence at St. Henry's parish in Belleville, "after consultation and approval of the Priest Personnel Board." Testimony at the trial established that St. Henry's parish is next door to St. Henry's Catholic Grade School and is near Althoff Catholic High School in Belleville. However, the Diocese did not provide the parishioners of St. Henry's with any information concerning the past allegations of child sexual abuse and held Kownacki out as being a safe and suitable priest to minister to the parishioners and have unsupervised contact

24

with their children.

As noted above, prior to the 1990s, the Catholic Church's code of canon law required the bishop, or someone whom he delegated, to investigate allegations of sexual abuse of minors by priests, and if the investigation showed the probability that something had happened, then a judicial trial was to be held. The Diocese did not conduct any such trials during the '60s, '70s, or '80s. In addition, Margason testified that, to his knowledge, during this period of time, the Diocese did not disclose to the public or to its parishioners any of the allegations it was aware of concerning their priests molesting or abusing minors.

In 1993, the Diocese adopted a "Policy Regarding Clerical Sexual Misconduct with Minors." The policy began as follows: "Sexual misconduct by a priest with a minor violates human dignity, priestly commitment and the mission of the church." Article 4 of the policy required all persons associated with the Diocese to comply with the letter and spirit of the policy, which required full and complete disclosure of allegations of clerical sexual abuse or misconduct with minors. The new policy established a review board charged with the duty of investigating allegations of sexual abuse or misconduct involving minors that were brought against parish priests. The review board investigated allegations that were either reported directly to members of the clergy or reported through a hotline the Diocese established for reporting such allegations. The review board investigated both current and past allegations of child sexual abuse.

The review board was composed of at least seven members appointed by the bishop. Four members were lay Catholics who were not employees of the Diocese, and three members were priests. Margie Mensen served as the administrator for the review board, and she held that position until 1998. She testified that her responsibility as the administrator for the review board was to investigate the allegations of child sexual abuse to determine whether the allegations were credible and to report her findings to the review board. She

25

also reported directly to the bishop and Margason. Mensen's duties included communicating with the victims of the child sexual abuse, offering them counseling, and communicating with the accused priests. Mensen did not have her own access to the priests' personnel files, but she had the right to ask to see them.

In September of 1993, Bishop Keleher was transferred to Kansas City, and Margason was again elected as the administrator of the Diocese until the appointment of a new bishop. Margason had helped draft the 1993 policy that established the review board, but after the review board was installed, he remained silent about his knowledge of past allegations of sexual abuse of minors by Kownacki. Margason served as the Diocese's administrator until Wilton D. Gregory was installed as the bishop in February of 1994.

Approximately seven months after his arrival at the Diocese, Bishop Gregory issued a press release which stated that he was going to personally review all the priests' personnel files to determine whether there was any information in the files that indicated prior undisclosed allegations of sexual abuse, molestation, or misconduct involving a priest and a minor. Bishop Gregory publicly announced that he wanted to ensure that there were no allegations of abuse that were undisclosed to the review board.

During his review of the priests' personnel files, Gregory reviewed Kownacki's file and felt that it should be brought to the attention of the review board. Gregory asked Mensen to review Kownacki's file, investigate, and take her findings before the review board. In October of 1994, Mensen reviewed Kownacki's personnel file at the chancery. The personnel file that Mensen reviewed, however, did not contain Sullivan's notes of the interview of Gina in 1973 and did not contain the 1982 confidential memo that named Wisniewski as a victim of Kownacki's abuse.

Kownacki's personnel file did include copies of the letters he wrote to Gina on April 26, 1973, and on May 2, 1973. Mensen found the letters to be troubling because they

seemed "very inappropriate for someone in the priest's position or someone of his adult age to be writing in such a personal manner to a young girl." To Mensen, the letters suggested undue and troubling closeness. Based on the letters, Mensen felt that there was cause to conclude that perhaps Gina had been a victim of childhood sexual abuse committed by Kownacki.

In addition to Kownacki's letters to Gina, Kownacki's file also included the June 21, 1982, letter from the mother of the freshman boy in Salem, Illinois, who complained to Schwaegel when Kownacki misrepresented the reason for his reassignment from St. Theresa's in Salem to the parish in Cobden. The file also included Schwaegel's June 25, 1982, response letter to the freshman boy's parents. These two letters caused Mensen to be concerned that there had been some sexual abuse or molestation by Kownacki at St. Theresa's. Mensen had no means to contact the two victims she identified in the file materials, so she contacted the victims' parents. Mensen subsequently interviewed Gina and her parents.

Both Gina and her parents told Mensen how Kownacki had befriended their family and had offered various forms of assistance. They told Mensen how Kownacki repeatedly and violently sexually molested Gina, that Gina became pregnant and thought Kownacki might have been the father, and that Kownacki drugged her and personally performed an abortion on her in the rectory which resulted in her unborn child dying *in utero*. Gina and her family described the emotional toll and pain Kownacki had caused, and Gina expressed concern about other children Kownacki might have had contact with. Gina told Mensen that no one from the Diocese offered her any help or assistance. Mensen testified that she found Gina very credible and that her symptoms were "very consistent with victims of sexual abuse."

After following up with the family in Salem, Illinois, Mensen concluded that

27

Kownacki should be removed from active ministry. She reported her conclusions to the review board, and the review board agreed that Kownacki was a risk to abuse or molest other children. The review board asked few questions, and its vote was unanimous. The Diocese removed Kownacki from active ministry on January 13, 1995. It placed him on administrative leave. Kownacki was not defrocked or punished. He collected retirement benefits from the Diocese, and at the time of the trial, he had suffered a stroke but was living by himself in an apartment in Dupo, Illinois.

Margason admitted at the trial that Kownacki was finally removed from active ministry 21 years after the Diocese first knew that Kownacki was a violent sexual child molester and 10 years after Margason himself became aware that Kownacki was a violent sexual child molester. The review board removed Kownacki based, in large part, on information that the Diocese had been aware of since the 1970s. Margason testified that had there been an independent review board in place in 1973, there was a good likelihood that Kownacki would have been removed then and would not have met Wisniewski.

Bishop Gregory held a press conference concerning Kownacki shortly after his removal, and an article about his removal appeared in the Diocese's newsletter, The Messenger, on January 20, 1995. The article stated that Kownacki was placed on administrative leave for allegations of sexual abuse that occurred more than 10 years prior.

Although Kownacki was removed from active ministry, the Diocese never disclosed to Mensen or the review board the existence of Sullivan's 1973 notes. As noted above, Sullivan's 1973 notes referenced other incidents of sexual abuse and molestation in addition to the incidents involving Gina. Sullivan's 1973 notes mentioned by name the twin boys from Guatemala who lived with Kownacki in Washington Park and another 14-year-old girl who was a parishioner in Washington Park as potential victims of Kownacki's sexual molestation. The notes also identified by name the housekeeper in Guatemala whom

Kownacki might have impregnated. Mensen testified that had she seen Sullivan's notes, she would have investigated these additional incidents and would have attempted to reach these potential victims.

Furthermore, the Diocese never disclosed to Mensen or the review board the 1982 confidential report that described the allegations from the family in Salem concerning their freshman son. As noted above, the 1982 report stated that Kownacki had claimed to have molested two other boys at the Salem parish, and Wisniewski was named as one of those boys. Therefore, when they investigated Kownacki, neither Mensen nor the review board was informed or was aware that Wisniewski was a victim of Kownacki's abuse. Mensen testified that, had the 1982 report been a part of Kownacki's file, she would have known that Wisniewski was a potential victim. She would have investigated the allegation and would have talked with Wisniewski to determine whether the abuse likely occurred.

Section 1.5 of the Diocese's 1993 policy regarding clerical sexual misconduct with minors provided as follows: "In the case of any disclosure of sexual misconduct with a minor, the Vicar General shall report the fact to the review administrator." Mensen testified that the policy included all sexual misconduct regardless of whether it occurred before or after the Diocese adopted the policy. She further testified that the Diocese violated its policy when it did not disclose the information in its possession that detailed additional, undisclosed allegations of sexual abuse and misconduct perpetrated by Kownacki, including his molestation of Wisniewski. Gregory testified that the missing documents should have been kept in Kownacki's personnel file, but they were not.

At the trial, Margason denied seeing the 1982 confidential memo until after Wisniewski filed his lawsuit against the Diocese, but he admitted that he was aware of some of Kownacki's other deviant sexual practices back in 1984, including the information contained in Sullivan's 1973 notes. He admitted that he never reported that information to

29

the review board at any time even though he had a duty under the Diocese's 1993 policy to do so. He admitted that he breached the policy and withheld information from the review board, a policy that he helped draft.[2]

## IV.

## Wisnewski's Injuries

Meanwhile, after Wisniewski moved away from Salem, he completed college and went to work in the healthcare industry at a hospital in Champaign, Illinois. He met and fell in love with his wife, Carol. They were married in 1984 and had two children together. Their daughter, Ashley, was born in October of 1987, and at the time of the trial, she was in her junior year at the University of Illinois. Their son, Andrew, was born in April of 1989, and he suffered from autism. Wisniewski testified that although his son was fairly high functioning, his son's autism prevented him from living on his own. Wisniewski suspected that their son would have to live with them the remainder of his life.

Wisniewski was successful at his chosen career and was promoted to be the director of his department at the hospital. Wisniewski testified that until 2002, he was happy and was leading a healthy and productive life. He and Carol had problems from time to time, and they faced the challenges of raising an autistic child, but they worked through and dealt with their problems. He enjoyed his family and being around people. At work, he effectively interacted with upper management and corporate executives. He was successful at repressing his memories of Kownacki's sexual abuse. Carol testified that Wisniewski had been a great father and had been actively involved in their children's lives. Wisniewski was a hard

_____

[2]In 2002, the Bishops of the United States adopted a nationwide policy for dealing with child sexual abuse and misconduct by priests, and that policy was adopted by the Diocese in July of 2003. This new policy replaced the 1993 policy.

worker, he made Carol laugh, and she made him laugh.

In 2002, however, Wisniewski's life changed. Carol and Wisniewski testified that, in early 2002, the national news carried stories about priests in Boston, Massachusetts, who had molested children. The reports were prominent in the national news. Wisniewski became overwhelmed with the scandal and could not get it out of his mind. He was particularly troubled by reports that the Boston priests had abused many victims. Thoughts of his own abuse continually came up in his mind. In the past he had successfully put those thoughts aside, but now he could not suppress the memories. Based on the news reports concerning the Boston priests, Wisniewski began to wonder if Kownacki had abused other victims either before or after his abuse. He became anxious, uptight, irritable, and overwhelmed with a feeling of guilt that there could have been more victims after he had been abused. Wisniewski started having trouble sleeping and began having nightmares. His memories and thoughts of Kownacki's abuse preoccupied his thinking.

Wisniewski had never told anyone what Kownacki had done to him. When the Boston priest scandal became national news, Carol read a lot of news articles about it, and one evening, she asked Wisniewski, "Father Ray never did anything to you, did he?" Wisniewski intended to go to his grave never saying anything to anyone about Kownacki's molestation, but Carol's question caught him off guard. He told her that he had been abused by Kownacki, beginning when he was 12 years old and continuing until he was about 17.

Carol testified that she felt devastated and asked Wisniewski why he had never said anything. Wisniewski told her about Kownacki's threats and told her that he had blocked it out of his mind. Carol testified, "It was like it was just buried in there and he built up a wall around himself." They spent most of that night crying, talking, and trying to make sense out of it.

Carol also testified that she noticed changes in Wisniewski's personality. Wisniewski

31

became withdrawn and irritable and no longer smiled, and his condition got worse over time. Carol testified that Wisniewski's condition was "awful" and "unbearable." He was short-tempered with her and their children, had lost confidence in himself, and started suffering from panic attacks and nightmares. He was no longer the person she had fallen in love with and married. The revelation of Kownacki's abuse had affected her, their marriage, their family, and their faith.

In May of 2002, Wisniewski sought help from a psychiatrist, David Kopacz. Kopacz testified that Wisniewski came to see him because he had been very upset "about the media coverage of sexual abuse in the Catholic church because he was abused by a priest when he was a boy." Kopacz described Wisniewski's symptoms as feeling overwhelmed, reliving specific episodes of abuse, having nightmares, waking up screaming, and not being able to forget what had happened in the past. Wisniewski tried to avoid the news because it was upsetting him more and more. Wisniewski told Kopacz that he had lost his faith in God and in the Church. According to Kopacz, there was no indication in Wisniewski's history after he went to college of any significant problems in functioning or coping in his life until the media coverage in early 2002.

Kopacz testified that Wisniewski came from a devout Catholic family that respected and integrated their church's priest into the family's life. Kopacz explained that, as a child, Wisniewski was very submissive and was programmed to believe everything Kownacki said. According to Kopacz, Kownacki used threats, coercion, and manipulation to alter Wisniewski's sense of reality. Kopacz initially made a temporary diagnosis that Wisniewski suffered from an adjustment disorder and anxiety, but he later concluded that he suffered from posttraumatic stress disorder that was a direct result of the childhood sexual abuse perpetrated by Kownacki. The posttraumatic stress disorder first manifested itself in 2002, one or two months before his diagnosis. Kopacz rated Wisniewski's symptoms on the border

32

between moderate and severe. Kopacz prescribed Wisniewski medications to help him sleep and to help with his anxiety.

On May 24, 2002, Wisniewski discussed with Kopacz whether he should inform his parents of the abuse, stating that he hoped to feel better after telling his parents. In addition, Wisniewski told Kopacz that he had been looking into some background information on how much the Diocese had known about Kownacki before he was transferred to Salem. On July 4, 2002, Wisniewski told his parents that Kownacki had molested him when he was a boy. His parents had no idea that Kownacki had abused him. They asked him why he had never said anything, and he told them of Kownacki's threats. In addition, he said he was embarrassed and just could not tell them.

After July 4, 2002, Marcy noticed Wisniewski losing weight. In addition, she testified that Wisniewski had always been a quiet person but that he spoke even less after July 4, 2002. After Wisniewski's disclosure to his parents, he rarely talked with his wife about the abuse. He refused to discuss it. Carol testified that Wisniewski was getting less than two hours of sleep each night, and she was worried that their family was not going to make it. On July 31, 2002, Wisniewski lost his job at the hospital for reasons unrelated to his lawsuit against the Diocese, and he and Carol subsequently opened a custom picture-framing business in Champaign.

Wisniewski continued to wonder what the Diocese knew about Kownacki before it transferred him to Salem, and he decided to take steps to find out. He did not believe that the Diocese would freely give him that information. He contacted an attorney, and on October 24, 2002, he filed his lawsuit against the Diocese. He testified that he filed the lawsuit to get the answers he wanted, and he hoped that some answers would help relieve his symptoms and guilt. Kopacz last saw Wisniewski on December 13, 2002. At that time, he still suffered from posttraumatic stress disorder.

Prior to filing the lawsuit, neither Wisniewski nor his parents knew that Kownacki had been removed from active ministry by the review board. Kownacki continued to send Wisniewski and his parents Christmas cards until Christmas of 2001. He signed the Christmas cards "Fr. Ray." They sent him cards in return, including birthday cards. No one from the Diocese ever contacted them to tell them that Kownacki had been removed and that they had information that Kownacki might have abused Wisniewski.

Dr. Peterson, a psychiatrist, evaluated Wisniewski for the purpose of giving an opinion at the trial about whether Wisniewski had experienced any psychological injury as a consequence of Kownacki's sexual molestation and, if so, when Wisniewski understood he was injured and whether he needed treatment. Peterson testified that children who have experienced prolonged sexual abuse often suffer psychological difficulty, such as major depression, posttraumatic stress disorder, substance abuse problems, and problems with their sexual functioning. They also frequently have many internal difficulties that they have a hard time expressing, and their issues stem from trying to make sense out of situations that should have never happened.

Peterson performed a comprehensive psychiatric assessment of Wisniewski that included obtaining his history. The facts that Wisniewski came from a devout Catholic family and that the molester was a priest were significant to Peterson. He testified that serial sexual abusers often get to know a family or they find children who are vulnerable in some way. When Wisniewski was growing up, his father was on the road often for business. In addition, the priest stood in the role of a special envoy between God and the family and was acting in a very important role in the spiritual life of Wisniewski's family. Wisniewski's parents trusted the priest and were disarmed by his position in the church. Peterson testified that this situation set up a power imbalance between Kownacki and Wisniewski which enabled Kownacki to very easily manipulate Wisniewski.

Peterson testified that Wisniewski did not initially appreciate or know that he was harmed because the priest overwhelmed him and because Wisniewski came to believe that he was actually acting in a positive way to help the priest. In Peterson's opinion, Wisniewski did not report the conduct to his parents because of Kownacki's position as the envoy between God and Wisniewski's family; he wielded incredible emotional and spiritual power. Wisniewski was 12 or 13 years old, which, psychologically, was a latency period when he was learning about morals and about what was right and wrong. Peterson explained that the priest, who was a hero to Wisniewski, told Wisniewski to do things that he was uncomfortable with but that the priest reassured him that it was not wrong.

In addition to interviewing Wisniewski, Peterson also gave Wisniewski a series of psychological tests. Peterson concluded that Wisniewski had experienced significant psychological trauma as a result of the sexual abuse he endured. Wisniewski suffered from posttraumatic stress disorder, chronic type of delayed onset, and he was experiencing a major depressive disorder with prominent anxiety.

Peterson believed that Wisniewski's posttraumatic stress disorder manifested itself when the media publicized the Boston priest scandal in January of 2002 and when his wife asked him directly about his experience. Prior to that time, "he never really thought about it." Peterson did not find any evidence that Wisniewski exhibited any criteria for posttraumatic stress disorder prior to January of 2002.

Peterson concluded that the repeated episodes of child molestation that started when Wisniewski was 12 caused him to develop posttraumatic stress disorder that did not manifest itself until 2002. According to Peterson, Wisniewski's mind had utilized defense mechanisms to minimize the effects of the abuse. Wisniewski came to believe that his abuser was right and that Wisniewski helped Kownacki. He accepted that Kownacki's affection toward him was a good thing, and while he never fully forgot the sexual acts themselves, his

35

main defense mechanism was believing that what he did was helpful to the priest.

Peterson explained that a lot of children and adults will keep such things inside until something pierces their defense mechanisms and overwhelms their psychological need to look away. In Wisniewski's case, Peterson testified, one of the things that seemed to comfort Wisniewski was that he believed that he was the only one who had been abused by Kownacki. In January of 2002, however, when sexual abuse by priests was national news, Wisniewski was faced with the possibility that potentially many others had been sexually abused. Peterson explained that the news stories overwhelmed Wisniewski's defenses and that when his wife directly asked him if he had been abused, he realized that what he had done was not to help the priest but that he had been manipulated and had been "misused." At that point, Wisniewski started experiencing the symptoms of posttraumatic stress disorder, including nightmares about what had happened, depression, loss of energy and focus, difficulty sleeping, persistent suicidal thoughts, and recollections about his abuse that intruded on his relationship with his wife.

Peterson testified that in his opinion, within a reasonable degree of medical certainty, when all of these events occurred in 2002, Wisniewski first became aware that he had sustained an injury as a result of the repeated acts of sexual molestation he suffered as a child. According to Peterson, Wisniewski needed two basic types of treatment. First, he needed medications to help relieve his depression and his anxiety disorder, including a combination of antidepressants, antianxiety agents, and perhaps some antiobsessional agents. He would need to be on such medications for 5 to 10 years at a minimum. Second, Wisniewski needed psychotherapy focused on the things that were most troubling to him and to his family as a consequence of realizing he was harmed. The psychotherapy Wisniewski needed would be "quite lengthy."

V.

36

Trial Court Proceedings and Jury Trial

Wisniewski filed his complaint against the Diocese on October 24, 2002, alleging several theories of liability. In addition, he alleged that the Diocese fraudulently concealed his cause of action against it and that, therefore, the Diocese should be barred from asserting as a defense the statute of limitations or the statute of repose. The Diocese subsequently filed a motion for a summary judgment that raised the statute of limitations and the statute of repose. The circuit court denied the Diocese's motion for a summary judgment. The circuit court held that Wisniewski's complaint was untimely under the relevant statutes of limitations and repose. However, the circuit court denied the Diocese's motion for a summary judgment because it found that Wisniewski had raised a question of fact to be determined by the jury concerning whether the Diocese fraudulently concealed his cause of action. Wisniewski had also raised a question of fact concerning whether the Diocese should be barred from asserting the statutes of limitations and repose based on the doctrines of equitable estoppel or equitable tolling.

At the jury trial, the circuit court instructed the jury that it would first have to determine whether the Diocese fraudulently concealed Wisniewski's cause of action. The jury was instructed that it could only address the issues of liability and damages if it found in Wisniewski's favor on the issue of fraudulent concealment. While the jury deliberated, the circuit court entered a separate order, ruling that Wisniewski's claims against the Diocese were not barred by the statute of limitations or the statute of repose. The circuit court found that Wisniewski had established equitable estoppel and equitable tolling by clear and convincing evidence. The jury then returned a verdict finding that the Diocese fraudulently concealed Wisniewski's cause of action against it and finding that the Diocese was liable for Wisniewski's injuries. The jury awarded Wisniewski $2.4 million in compensatory damages and $2.6 million for punitive damages. The Diocese filed a motion for a judgment

notwithstanding the verdict (*n.o.v.*) that raised, among other issues, the statute of limitations and the statute of repose. The circuit court denied the Diocese's motion for a judgment *n.o.v.* The Diocese appeals.

## ANALYSIS

The Diocese raises the following arguments on appeal: (I) that, as a matter of law, Wisniewski's claims are time-barred by the relevant statute of repose and statute of limitations, (II) that Wisniewski's claims were legally insufficient, (III) that the circuit court abused its discretion in denying its request to perform a mental examination of Wisniewski pursuant to Illinois Supreme Court Rule 215 (eff. July 1, 2002), and (IV) that the circuit court abused its discretion in making certain evidentiary rulings. We will discuss each argument in turn.

## I.

### Statute of Repose and Statute of Limitations

The first arguments that the Diocese raises on appeal are that Wisniewski's claims against it are time-barred as a matter of law by the relevant statute of repose and statute of limitations. The Diocese also argues that, as a matter of law, neither the fraudulent concealment statute nor the common law discovery rule tolled the running of the statute of repose or the statute of limitations. The Diocese concludes that the circuit court, therefore, should have granted its motion for a judgment *n.o.v.* at the conclusion of the trial because Wisniewski's claims were untimely.

At the outset, we note that the Diocese does not contend on appeal that the jury was improperly instructed on any of the issues it decided; therefore, we will assume that the jury was properly instructed. See *Ford v. Baker*, 61 Ill. App. 3d 45, 46, 377 N.E.2d 853, 854 (1978). When the jury has been properly instructed, we are reluctant to set aside the jury's verdict, because many factors, including the credibility of the witnesses, are considered by

the jury in reaching its verdict. See *Ford*, 61 Ill. App. 3d at 46, 377 N.E.2d at 854 ("When the jury has been properly instructed, both trial and reviewing courts are reluctant to set aside the amount of the jury verdict.").

A statute of repose and a statute of limitations are separate and distinct statutes that place a limitation on the time in which a plaintiff has to file his or her lawsuit. The difference between a statute of limitations and a statute of repose is that "a statute of limitations governs the time within which lawsuits may be commenced after a cause of action has accrued, while a statute of repose extinguishes the action itself after a fixed period of time, regardless of when the action accrued." *DeLuna v. Burciaga*, 223 Ill. 2d 49, 61, 857 N.E.2d 229, 237 (2006).

In general, the statute of limitations begins to run on the date the plaintiff's cause of action accrues, and in personal injury actions, that usually occurs on the date of the injury. *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360, 657 N.E.2d 894, 898 (1995). However, the application of this general rule could be unduly harsh if it barred a plaintiff from bringing suit before the plaintiff was even aware that he was injured. *Golla*, 167 Ill. 2d at 360, 657 N.E.2d at 898. "To alleviate the harsh consequences that would flow from literal application of the limitations period, the judiciary created the 'discovery rule,'" which "postpone[s] the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Golla*, 167 Ill. 2d at 360-61, 657 N.E.2d at 898.

A statute of repose, however, is designed to place an outer limit on the "long tail" of liability created by the common law discovery rule. *Hester v. Diaz*, 346 Ill. App. 3d 550, 553, 805 N.E.2d 255, 259 (2004). Accordingly, a statute of repose "is intended to terminate the possibility of liability after a defined period of time, regardless of a potential plaintiff's lack of knowledge of his or her cause of action." *Ferguson v. McKenzie*, 202 Ill. 2d 304,

311, 780 N.E.2d 660, 664 (2001). Statutes of repose do not incorporate the discovery rule and generally terminate claims regardless of a plaintiff's lack of knowledge of his or her cause of action. *Goodman v. Harbor Market, Ltd.*, 278 Ill. App. 3d 684, 690-91, 663 N.E.2d 13, 18 (1995).

Although a statute of repose does not normally incorporate the discovery rule, a statute of repose, nonetheless, can be tolled if a plaintiff does not discover his claim due to fraudulent concealment on the part of the defendant. In *DeLuna*, the Illinois Supreme Court held that fraudulent concealment can toll the running of a statute of repose because "there would be an obvious and gross injustice in a rule that allows a defendant–particularly a defendant who stands in a fiduciary relationship to the plaintiff–to conceal the plaintiff's cause of action and then benefit from a statute of repose." *DeLuna*, 223 Ill. 2d at 71, 857 N.E.2d at 242.

In the present case, Wisniewski was abused in the 1970s and maintained that he did not discover his claim until 2002. In order to toll the running of the statute of limitations under the common law discovery rule, Wisniewski was required to prove that he neither knew nor reasonably should have known that he had been injured and that his injury was wrongfully caused until 2002. To toll the running of the statute of repose, however, under the fraudulent concealment statute, Wisniewski had to prove not only that he did not discover his claim until 2002 but also that his failure to discover his claim was due to fraudulent concealment committed by the Diocese.

We begin our analysis of the circuit court's denial of the Diocese's motion for a judgment *n.o.v.* with a discussion of the applicable statute of repose and the jury's finding of fraudulent concealment. We will then discuss the statute of limitations and application of the common law discovery rule to the facts of the case. Based on our analysis, we conclude that the circuit court properly denied the Diocese's motion for a judgment *n.o.v.* on

40

the issues concerning the timeliness of Wisniewski's claim. We find that, under the facts of this case, the application of the fraudulent concealment statute and the common law discovery rule presented factual issues for the jury to consider, not legal issues that the circuit court was required to find in the Diocese's favor as a matter of law.

(A)

Statute of Repose

Prior to January 1, 1991, Illinois did not have a statute of repose applicable to personal injury claims arising from childhood sexual abuse. On January 1, 1991, the Illinois General Assembly added section 13-202.2 to the Illinois Code of Civil Procedure (the Code) (Ill. Rev. Stat. 1991, ch. 110, par. 13-202.2), which established a statute of repose applicable to childhood sexual abuse cases. When enacted in 1991, section 13-202.2(b) read as follows:

> "(b) An action for damages for personal injury based on childhood sexual abuse must be commenced within 2 years of the date the person abused discovers or through the use of reasonable diligence should discover that the act of childhood sexual abuse occurred and that the injury was caused by the childhood sexual abuse, but in no event may an action for personal injury based on childhood sexual abuse be commenced more than 12 years after the date on which the person abused attains the age of 18 years." Ill. Rev. Stat. 1991, ch. 110, par. 13-202.2(b).

Accordingly, section 13-202.2(b), as enacted in 1991, contained a 2-year statute of limitations and a 12-year statute of repose.

The effect of the enactment of the 1991 statute of repose contained in section 13-202.2 was "to bar anyone over the age of 30 from bringing an action for personal injury based on childhood sexual abuse." *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 408, 917 N.E.2d 475, 484 (2009). In the present case, Wisniewski turned 30 on March 6, 1991, approximately two months after the legislature enacted the statute of repose.

41

Effective January 1, 1994, the legislature eliminated the 12-year statute of repose for childhood sexual abuse claims. After the 1994 amendment, section 13-202.2(b) provided as follows:

"(b) An action for damages for personal injury based on childhood sexual abuse must be commenced within 2 years of the date the person abused discovers or through the use of reasonable diligence should discover that the act of childhood sexual abuse occurred and that the injury was caused by the childhood sexual abuse." 735 ILCS 5/13-202.2(b) (West 1994).

However, the legislature's repeal of the statute of repose is not applied retroactively to revive claims that had expired prior to the repeal of the statute of repose. The Illinois Supreme Court has held that the Illinois Constitution does not permit retroactive application of amendments to section 13-202.2(b) to revive otherwise time-barred claims for childhood sexual abuse. *Diocese of Dallas*, 234 Ill. 2d at 409, 917 N.E.2d at 484. The court stated, " '[I]f the claims were time-barred under the old law, they remained time-barred even after the repose period was abolished by the legislature.' " *Diocese of Dallas*, 234 Ill. 2d at 409, 917 N.E.2d at 484 (quoting *M.E.H. v. L.H.*, 177 Ill. 2d 207, 215, 685 N.E.2d 335, 339 (1997)). Accordingly, for purposes of analyzing the timeliness of Wisniewski's claim with respect to the statute of repose, we must apply the 1991 version of section 13-202.2 of the Code to his claim.

Under the 1991 statute of repose, Wisniewski had until he turned 30 to file his action against the Diocese, but he did not file his claim until 2002, when he was 41 years old. In response to the statute of repose, Wisniewski invoked the fraudulent concealment statute and maintained that he did not discover that he was injured and did not discover the Diocese's wrongful conduct until 2002 because of the Diocese's fraudulent concealment. The issue of fraudulent concealment was submitted to the jury, and the jury decided the issue in

Wisniewski's favor.

(1)

The Jury's Finding of Fraudulent Concealment

As we stated, prior to the trial, the Diocese filed a motion for a summary judgment that raised the statute of repose. The circuit court, however, denied the Diocese's motion, finding that there were material issues of fact concerning the application of the fraudulent concealment statute to toll the running of the statute of repose. The circuit court determined that it would submit the issue of fraudulent concealment to the jury to be decided before the jury considered issues of liability and damages.

At the trial, the jury resolved the issue of fraudulent concealment in Wisniewski's favor by entering a verdict deciding that issue in his favor. The jury also entered a general verdict in Wisniewski's favor awarding damages. At the conclusion of the trial, the Diocese filed a motion for a judgment *n.o.v.*, arguing, among other things, that the evidence did not establish fraudulent concealment as a matter of law. The circuit court denied the Diocese's motion for a judgment *n.o.v.*, and on appeal, the Diocese argues that the circuit court erred in denying the motion. Therefore, the fraudulent concealment issue is presented to us on appeal by way of the circuit court's denial of a motion for a judgment *n.o.v.*

A trial court's ruling on a motion for a judgment *n.o.v.* is subject to a *de novo* standard of review. *McClure v. Owens Corning Fiberglas Corp.*, 188 Ill. 2d 102, 132, 720 N.E.2d 242, 257 (1999). A judgment *n.o.v.* is properly entered only in those limited cases where "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). "In ruling on a motion for a judgment *n.o.v.*, a court does not weigh the evidence, nor is it concerned with the credibility of the witnesses; rather it may only consider the

43

evidence, and any inferences therefrom, in the light most favorable to the party resisting the motion." *Maple v. Gustafson*, 151 Ill. 2d 445, 453, 603 N.E.2d 508, 512 (1992). "Most importantly, a judgment *n.o.v.* may not be granted merely because a verdict is against the manifest weight of the evidence." *Maple*, 151 Ill. 2d at 453, 603 N.E.2d at 512. Therefore, in the present case, we are asked to determine, among other issues, whether the evidence justified the submission of the fraudulent concealment issue to the jury. See *Valdes v. Karoll's, Inc.*, 277 F.2d 637, 638 (7th Cir. 1960). Applying this standard, we cannot say that the evidence supports only one reasonable conclusion in the Diocese's favor on the issue of fraudulent concealment. Rather, we find that there was ample evidence to support the jury's verdict on that issue.

The doctrine of fraudulent concealment is codified in section 13-215 of the Code, and it provides, "If a person liable to an action fraudulently conceals the cause of such action from the knowledge of the person entitled thereto, the action may be commenced at any time within 5 years after the person entitled to bring the same discovers that he or she has such cause of action, and not afterwards." 735 ILCS 5/13-215 (West 2008). "Fraudulent concealment, as codified in section 13-215, is not a cause of action in and of itself; rather, it acts as an exception to the time limitations imposed on other, underlying causes of action." *Cangemi v. Advocate South Suburban Hospital*, 364 Ill. App. 3d 446, 459, 845 N.E.2d 792, 805 (2006).

"The concealment contemplated in section 13-215 must consist of affirmative acts or representations which are calculated to lull or induce a claimant into delaying filing of his claim or to prevent a claimant from discovering his claim." *Smith v. Cook County Hospital*, 164 Ill. App. 3d 857, 862, 518 N.E.2d 336, 340 (1987). "A plaintiff must plead and prove that the defendant made misrepresentations or performed acts which were known to be false, with the intent to deceive the plaintiff, and upon which the plaintiff detrimentally relied."

*Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 18, 885 N.E.2d 999, 1009 (2007).

As a general rule, mere silence on the part of the defendant and a failure by the plaintiff to learn of the cause of action are not enough to establish fraudulent concealment. *Chicago Park District v. Kenroy, Inc.*, 78 Ill. 2d 555, 561, 402 N.E.2d 181, 185 (1980). However, there is an exception to this general rule when there is a fiduciary or trust or other confidential relationship between the plaintiff and the defendant. *Chicago Park District*, 78 Ill. 2d at 562, 402 N.E.2d at 185. The prevailing rule is that when such a relationship exists, the person occupying the position of fiduciary or of confidence is under a duty to reveal the facts to the plaintiff, and his silence is as fraudulent as an actual affirmative false representation or act. *Chicago Park District*, 78 Ill. 2d at 562, 402 N.E.2d at 185. Silence by a person in a position of trust concerning the facts giving rise to a cause of action amounts to fraudulent concealment. *Chicago Park District*, 78 Ill. 2d at 562, 402 N.E.2d at 185.

On appeal, the Diocese argues that the evidence was insufficient to submit the issue of fraudulent concealment to the jury because there was no evidence presented at the trial that the Diocese made any misrepresentations directly to Wisniewski that lulled him into delaying the filing of his claim or prevented him from discovering he had a claim against the Diocese. In addition, the Diocese maintains that it was not in a fiduciary, special, or confidential relationship with Wisniewski and that, therefore, its silence with respect to Wisniewski's claim does not support a finding that it fraudulently concealed the claim. We disagree. When viewing the evidence presented at the trial in the light most favorable to Wisniewski, we cannot conclude that the evidence so overwhelmingly favors the Diocese on the issue of fraudulent concealment that the jury's verdict cannot stand.

At the trial, the circuit court instructed the jury to first decide whether the Diocese fraudulently concealed the cause of action from Wisniewski before it considered issues of liability and damages. The jury instructions defined "fraudulent concealment" as follows:

"a)  Affirmative acts or representations made by the defendant that were designed to prevent and, in fact, did prevent[] plaintiff from discovering his claim against the defendant; or

b) The defendant failed to disclose all material facts concerning the existence of plaintiff's cause of action against the defendant and there was a special relationship that existed between plaintiff and defendant whereby the plaintiff placed trust and confidence in defendant thereby placing defendant in a position of influence and superiority over plaintiff."

The jury instructions further stated that Wisniewski had the burden of proving, by clear and convincing evidence, that the Diocese fraudulently concealed his cause of action and that he commenced his cause of action against the Diocese within five years of discovering it.  As noted above, the Diocese does not take issue with the jury instructions, and we believe that Wisniewski presented evidence from which the jury could find in his favor on the issue of fraudulent concealment as defined in the jury instructions.

The first prong of the jury instruction defining fraudulent concealment stated that fraudulent concealment included "acts or representations made by the defendant that were designed to prevent and, in fact, did prevent[] plaintiff from discovering his claim against the defendant."  The Diocese maintains that, as a matter of law, evidence of acts or representations its officers made with respect to Kownacki's qualifications to be a priest after Wisniewski left the Salem parish in 1980 cannot support the jury's finding of fraudulent concealment because there was no evidence presented that Wisniewski was aware of the officers' acts or representations that occurred after he left the Salem parish.  With respect to the affirmative representations made by Kownacki, *i.e.*, that the abuse was a good thing that helped the priest, the Diocese argues that Wisniewski did not present any evidence that any officer or principal of the Diocese knew of Kownacki's representations to Wisniewski at the

46

time he made them. Therefore, the Diocese concludes, Kownacki's representations to Wisniewski cannot constitute affirmative acts of fraudulent concealment on the part of the Diocese as defined under the first prong of the fraudulent concealment definition. See *Barbour v. South Chicago Community Hospital*, 156 Ill. App. 3d 324, 330-31, 509 N.E.2d 558, 563 (1987) ("Illinois courts, including the supreme court, have refused to expand *** section 13-215 to include an unknowing principal.").

We need not determine whether Wisniewski presented sufficient evidence to establish fraudulent concealment under the first prong of the definition instruction because we hold that Wisniewski presented sufficient evidence to establish fraudulent concealment under the second prong of the definition instruction. See, *e.g.*, *Krklus v. Stanley*, 359 Ill. App. 3d 471, 479, 833 N.E.2d 952, 959 (2005) (when there is a general verdict after more than one theory has been presented to a jury, the verdict will be upheld on appeal if there was sufficient evidence to sustain any of the theories presented).

The second prong of the fraudulent concealment definition instruction stated that fraudulent concealment occurs if the "defendant failed to disclose all material facts concerning the existence of plaintiff's cause of action against the defendant and there was a special relationship that existed between plaintiff and defendant whereby the plaintiff placed trust and confidence in defendant thereby placing defendant in a position of influence and superiority over plaintiff." In challenging a finding of fraudulent concealment under the second prong of the definition instruction, the Diocese argues that, as a matter of law, it did not have a special relationship with Wisniewski or occupy a position of trust. We disagree. We believe that the issue of whether a relationship of trust existed between Wisniewski and the Diocese was not an issue to be decided by the court as a matter of law but was a factual issue that was properly submitted to the jury to decide.

(a)

47

Evidence of a Special Relationship That Placed the Diocese and Its Officers and Agents

in a Position of Influence and Superiority Over Wisniewski

The jury heard evidence that the Diocese, its officers, its priests, and its parish in Salem, Illinois, played a central role in Wisniewski's life from the time his parents first moved to Salem when he was a young boy and throughout his childhood. The family was very active in church life, and Wisniewski and his siblings were taught to obey and believe everything the Diocese's bishops, monsignors, and priests said to them. Wisniewski was an active parishioner and an altar boy and was taught to trust and respect the Diocese and put his faith and trust in its agents and employees. He attended the Diocese's Catholic grade school for a number of years, worked around the parish, and expressed interest in becoming a Catholic priest.

The agents and employees of the Diocese were held in high esteem in Wisniewski's family and were placed on a pedestal, and the Diocese itself fostered, promoted, and encouraged this trusting relationship by urging its parishioners to trust their priests' "knowledge, piety, prudence, experience, and general character." In fact, when the Diocese appointed Kownacki to the parish in Salem, the bishop, as the Diocese's CEO, "command[ed] all, whom it may concern, to recognize [Kownacki] as such Pastor and grant [him] all necessary assistance." The Diocese successfully garnered this trust with Wisniewski's parents and with Wisniewski, and it is this very trust that Kownacki exploited in order to sexually abuse Wisniewski for years. The Diocese's assertion that the evidence was insufficient for the jury to conclude that it held a position of trust over Wisniewski is entirely unconvincing. The evidence overwhelmingly established that Wisniewski placed his trust and confidence in the Diocese and that the Diocese not only accepted that trust and confidence but encouraged and promoted it.

The Diocese argues that Illinois courts and public policy do not recognize any duty,

48

fiduciary or otherwise, between a parishioner and his pastor. The Diocese cites three cases in support of this argument: *Dausch v. Rykse*, 52 F.3d 1425, 1438-39 (7th Cir. 1994) (*per curiam*), *Maryland Casualty Co. v. Havey*, 887 F. Supp. 195, 200 (C.D. Ill. 1995), and *Amato v. Greenquist*, 287 Ill. App. 3d 921, 931-32, 679 N.E.2d 446, 453-54 (1997). These cases are not persuasive in the present case because they do not analyze the relationship between a parishioner and a priest or a diocese in terms of applying the fraudulent concealment statute.

In *Amato*, the plaintiff sued a pastor, a bishop, and a church organization for psychotherapy malpractice and a breach of a fiduciary duty after the plaintiff received marriage counseling from the pastor at the same time the pastor was having an affair with the plaintiff's wife. *Amato*, 287 Ill. App. 3d at 923, 679 N.E.2d at 448. The trial court dismissed the plaintiff's complaint for various reasons but primarily because Illinois did not recognize the tort of clergy malpractice and because the relationship between cleric and parishioner was not a fiduciary one. *Amato*, 287 Ill. App. 3d at 924, 679 N.E.2d at 449.

On appeal, the *Amato* court held that the first amendment "prohibited the recognition of an action for breach of fiduciary duty premised upon the counselling relationship between a cleric and a church member with whom the cleric had been sexually involved." *Amato*, 287 Ill. App. 3d at 932, 679 N.E.2d at 454 (citing *Dausch v. Rykse*, 52 F.3d 1425, 1438 (7th Cir. 1994) (*per curiam*)). The court recognized that the relationship between a cleric and a parishioner "reflects many aspects of a fiduciary one," but it held that under Illinois law, a contention that a cleric has breached his duty as a fiduciary is not actionable because religion is the foundation for that claim. *Amato*, 287 Ill. App. 3d at 932, 679 N.E.2d at 454. The court noted that in Illinois the courts have refused to entertain similar claims of "clergy malpractice" because "the first amendment's free exercise clause prohibits courts from considering claims requiring the interpretation of religious doctrine." *Amato*, 287 Ill. App.

49

3d at 925-26, 679 N.E.2d at 450.

In *Maryland Casualty Co.*, the court had to determine an insurance company's duty to defend a complaint filed by parishioners against a priest and the Diocese of Springfield. *Maryland Casualty Co.*, 887 F. Supp. at 196. The complaint alleged that the priest sexually abused the parishioners when they were approximately 11 or 12 years old. *Maryland Casualty Co.*, 887 F. Supp. at 196. In analyzing whether the parishioners could recover under a theory that the priest negligently breached his duties as a priest, the court stated, "Illinois courts have refused to create a legally recognized duty between clergymen and their congregation." *Maryland Casualty Co.*, 887 F. Supp. at 200 (citing *Dausch v. Rykse*, 52 F.3d 1425 (7th Cir. 1994) (*per curiam*)). The court concluded that without that duty, the parishioners could not maintain an action for the negligent infliction of emotional distress or for the breach of a fiduciary duty. Therefore, the insurance company did not have a duty to defend those claims because they did not state a claim for which relief could be granted. *Maryland Casualty Co.*, 887 F. Supp. at 200.

In *Dausch*, a member of a church's congregation filed a claim against the church and its pastor, alleging that the pastor improperly engaged in sexual relations with her when she sought counseling. *Dausch*, 52 F.3d at 1427. The plaintiff alleged, among other things, that the pastor "held himself out *** to be a duly qualified person engaged in providing psychological counseling" and committed "professional negligence" by engaging in "sexual relations" with her during counseling sessions. *Dausch*, 52 F.3d at 1427-28. The trial court granted the defendants' motion to dismiss the complaint for a failure to state a claim upon which relief could be granted. *Dausch*, 52 F.3d at 1428.

On appeal, the *Dausch* court noted that Illinois has rejected a cause of action for clergy malpractice because the evaluation of those claims would require the courts to evaluate religious tenets. *Dausch*, 52 F.3d at 1432 (Ripple, J., concurring in part and

50

dissenting in part).[3] However, the court also noted that the courts' refusal to examine the conduct of the clergy "has not been extended to situations in which the conduct in question does not bear such a direct relationship to the doctrinal or organizational aspects of religious practice." *Dausch*, 52 F.3d at 1432 (Ripple, J., concurring in part and dissenting in part). Illinois allows judicial scrutiny of the conduct of clergy that "does not implicate judicial assessment of the tenets of a particular religion or a determination of whether a particular litigant has adhered to those tenets." *Dausch*, 52 F.3d at 1433 (Ripple, J., concurring in part and dissenting in part). Under those circumstances, the sole inquiry is whether the individual has engaged in conduct that the state has deemed harmful. *Dausch*, 52 F.3d at 1433 (Ripple, J., concurring in part and dissenting in part). In other words, "[t]ort claims for behavior by a cleric that does not require the examination of religious doctrine are cognizable." *Dausch*, 52 F.3d at 1433 (Ripple, J., concurring in part and dissenting in part). In addressing the plaintiff's allegation that the defendants breached a fiduciary duty they owed to her, the *Dausch* court held that alleging a breach of a fiduciary relationship "was simply an elliptical way of alleging clergy malpractice." *Dausch*, 52 F.3d at 1438 (Ripple, J., concurring in part and dissenting in part). The court stated, "If the court were to recognize such a breach of fiduciary duty, it would be required to define a reasonable duty standard and to evaluate [the pastor's] conduct against that standard, an inquiry identical to that which Illinois has declined to undertake in the context of a clergy malpractice claim and one that is of doubtful validity under the Free Exercise Clause." *Dausch*, 52 F.3d at 1438 (Ripple, J., concurring in part and dissenting in part).

The present issue is distinguishable from the issues in *Amato*, *Maryland Casualty Co.*, and *Dausch* because the issue in the present case is not whether Wisniewski can maintain

_____

[3]Judge Ripple wrote separately, concurring in part and dissenting in part, but the concurring portions of his opinion are the majority holdings on the issues addressed therein.

a cause of action against the Diocese for clergy malpractice. Instead, the issue is whether there was a special relationship between Wisniewski and the Diocese for purposes of the fraudulent concealment statute, and the analysis of that issue does not involve any judicial analysis of religious doctrine or whether the Diocese adhered to religious tenets. As the court in *Amato* stated, the relationship between a priest and a parishioner reflects many aspects of a special or fiduciary relationship (*Amato*, 287 Ill. App. 3d at 932, 679 N.E.2d at 454), and it is those aspects of the relationship that are relevant to the application of the fraudulent concealment statute to the facts of the present case.

A determination that a special relationship existed between Wisniewski and the Diocese did not require the court or the jury to engage in interpretation of religious doctrine, but only to determine whether Wisniewski placed his trust and confidence in the Diocese thereby placing the Diocese in a position of influence and superiority over him. The jury's determination of this issue did not implicate the free exercise clause of the first amendment. The jury was asked to determine whether the special relationship existed and, if so, whether the Diocese failed to disclose all material facts concerning the existence of Wisniewski's claim against it. To invoke the protection of the first amendment, the Diocese must assert that the conduct at issue was "rooted in religious belief." *Sanders v. Casa View Baptist Church*, 134 F.3d 331, 337-38 (5th Cir. 1998). The Diocese does not and cannot contend that its silence about the abuse committed by Kownacki was a part of Catholic religious beliefs and practices. On the contrary, the evidence at the trial established that the Diocese considered Wisniewski's abuse as "dirty laundry" that it did not want to hang out in public.

Furthermore, contrary to the Diocese's assertion on appeal, in affirming the circuit court's denial of its motion for a judgment *n.o.v.*, we are not required to hold that the Diocese has a special or fiduciary relationship, as a matter of law, with all of its parishioners. Instead, we hold that it was an issue of fact for the jury to decide. Consistent with the

established standard of review for the denial of a motion for a judgment *n.o.v.*, we hold that the jury in the present case was entitled to find, based on the evidence presented at the trial, that the Diocese held a position of trust and confidence with Wisniewski for purposes of the application of the fraudulent concealment statute.

(b)

The Diocese's Failure to Disclose All Material Facts Concerning the Existence of Wisniewski's Cause of Action Against It

Since the evidence was sufficient for the jury to conclude that the Diocese held a special relationship with Wisniewski, the next step in our analysis under the second prong of the fraudulent concealment definition instruction is to determine whether the jury could have concluded that the Diocese failed to disclose all material facts concerning Wisniewski's claim against it in light of the special relationship. As noted above, the Diocese argues that Kownacki's fraudulent representations that the sexual abuse was good and helpful to the priest does not constitute *affirmative* acts or representations attributable to the Diocese to support a finding of fraudulent concealment under the first prong of the definition instruction because there was no evidence that it was aware of the representations at the time they were made. However, under the facts of this case, the jury could, nonetheless, find that the Diocese's *silence* after it learned that Wisniewski was abused by Kownacki constituted fraudulent concealment of Wisniewski's cause of action under the second prong of the definition instruction.

The jury learned that the Diocese became aware of Kownacki's abuse of Wisniewski as early as 1982 when the parents of the freshman boy reported to the Diocese's officers at the chancery that their son had been abused by Kownacki. The parents reported that Kownacki represented to their son that the abuse was okay and was "a sign of friendship." Kownacki made the freshman boy promise not to tell his parents and told the boy that he had

done the same thing with Wisniewski. The jury also considered evidence that the Diocese was aware that in the 1970s Kownacki abused Gina and did so by telling her that the sexual abuse was acceptable in the eyes of God and the Church.

Accordingly, the jury heard evidence that, in 1982, the officers of the Diocese were aware that Kownacki had sexually abused several minor parishioners, including Wisniewski, and, importantly, that a crucial element of Kownacki's method of abuse was positive coercion, *i.e.*, representations that the abuse was a good thing. The Diocese was aware that Kownacki made those representations as a Diocesan priest and that he used his position as its priest as an inroad for facilitating his abuse and for lending credibility to the false representations he made to his victims. In other words, the Diocese was aware that Kownacki made misrepresentations to his child victims concerning the nature of the sexual abuse, using the Diocese's special relationship with its child parishioners to influence his victims into believing that the abuse was a good thing. This evidence was sufficient for the jury to find that the Diocese's special relationship with Wisniewski as a St. Theresa's parishioner created an affirmative duty on the part of the Diocese to contact Wisniewski about Kownacki's abuse and disavow Kownacki's representations that his abuse was good and helpful to the priest. The Diocese, however, remained silent. Considering the instructions given to the jury and viewing the evidence in light most favorable to Wisniewski, the evidence was more than sufficient for the jury to find that the Diocese's continued silence after learning that Wisniewski was abused was the equivalent of an affirmative act of fraudulent concealment of Wisniewski's claim against it.

(c)

The Diocese's Silence Prevented Wisniewski From (1) Discovering That He Sustained an Injury and (2) Discovering That the Diocese's Wrongful Conduct Caused His Injuries

54

The next step in our analysis is to determine whether the evidence was sufficient for the jury to find that the Diocese's silence prevented Wisniewski from discovering his claim until 2002. The fraudulent concealment must have lulled Wisniewski into delaying the filing of his claim or prevented him from discovering his claim. See *Smith v. Cook County Hospital*, 164 Ill. App. 3d 857, 862, 518 N.E.2d 336, 340 (1987). We believe that the evidence was sufficient for the jury to conclude that the Diocese's fraudulent concealment by silence prevented Wisniewski from discovering his claim until 2002.

On the issue of when Wisniewski discovered his claim, the jury was instructed as follows:

"The plaintiff is deemed to have discovered his cause of action when he both:

1) Knows or should have known that he has sustained an injury; and

2) That the injury was caused by the wrongful conduct of the defendant."

With respect to the first prong of this definition instruction, Wisniewski presented evidence from which the jury could find that he did not know and should not have known that he sustained any injury from Kownacki's abuse until 2002 when the Boston priest scandal became national news and that the Diocese's silence prevented him from discovering his injuries before that time.

The evidence supported a finding that the specific injury that Wisniewski suffered was posttraumatic stress disorder that first manifested itself in January of 2002. A psychiatrist who examined Wisniewski, Dr. Peterson, testified that prior to 2002, Wisniewski did not exhibit any criteria for posttraumatic stress disorder because, in part, Wisniewski came to believe that Kownacki's representations were correct and that he helped the priest by submitting to the abuse. The psychiatrist told the jury that Wisniewski accepted that Kownacki's abuse was a good thing and that a major part of Wisniewski's psychological defense mechanism was believing that what happened was helpful to the priest. In 2002,

however, the news stories of child sexual abuse by Boston priests overwhelmed Wisniewski's defenses, and he then, for the first time, began suffering from the symptoms of posttraumatic stress disorder, including nightmares, depression, loss of energy and focus, difficulty sleeping, persistent suicidal thoughts, and recollections about his abuse that interfered with his everyday life. Peterson testified that in his opinion, to a reasonable degree of medical certainty, in 2002, Wisniewski first became aware that he had sustained an injury as a result of the repeated acts of sexual molestation committed by the Diocese's priest.

Likewise, another psychiatrist, Dr. Kopacz, testified that there was no indication in Wisniewski's history after he left the Salem parish of any significant problems in functioning or coping in his life until the media coverage of the Boston priest scandal in early 2002. Kopacz explained to the jury that, as a child, Wisniewski was very submissive and was programmed to believe everything Kownacki said, which allowed Kownacki to manipulate Wisniewski's sense of reality. However, the media coverage of the Boston scandal overwhelmed Wisniewski, and he began experiencing posttraumatic stress disorder.

The jury could have concluded from this evidence that the Diocese's fraudulent concealment by silence after it learned of Wisniewski's abuse prevented Wisniewski from discovering his injuries until 2002. The Diocese, having knowledge of Kownacki's abuse and false representations in 1982, failed to contact Wisniewski and address the abuse or address Kownacki's representations concerning the nature of the abuse Kownacki made as its priest. The jury could have found this evidence particularly compelling given (1) the special relationship that existed between the Diocese and Wisniewski, (2) that Kownacki's manipulation of Wisniewski's perception of reality occurred when Wisniewski was a young and impressionable parishioner, and (3) that Kownacki exploited the Diocese's special relationship with Wisniewski in order to abuse Wisniewski and manipulate his sense of reality. Under these facts, the evidence was sufficient for the jury to find in Wisniewski's

favor on the issue of when he is deemed to have discovered his cause of action.

Furthermore, under the second prong of the jury instruction that defined when Wisniewski is deemed to have discovered his claim, the evidence was sufficient for the jury to conclude that Wisniewski had no reason to know of or suspect any wrongdoing by the Diocese prior to 2002. There was no evidence to suggest that Wisniewski was aware or should have been aware that the officers of the Diocese actually knew of Kownacki's pedophile tendencies when it appointed him as the parish priest and knew of Kownacki's use of false representations as a positive coercion tactic to facilitate his abuse.

We find *Chicago Park District v. Kenroy, Inc.*, 78 Ill. 2d 555, 563, 402 N.E.2d 181, 185 (1980), instructive in analyzing the circuit court's denial of the Diocese's motion for a judgment *n.o.v.* on the issue of fraudulent concealment. In *Chicago Park District*, a park district initiated eminent domain proceedings to acquire a parcel of real property owned by the defendants. Prior to the proceedings, however, the defendants bribed a city alderman to rezone the property, which increased its value by $5 million. *Chicago Park District*, 78 Ill. 2d at 559, 402 N.E.2d at 183. The City of Chicago and the park district did not discover the fraud until several years later, after which they brought a lawsuit against the defendants, alleging the fraud and seeking the imposition of a constructive trust and to recover actual and punitive damages. *Chicago Park District*, 78 Ill. 2d at 559-60, 402 N.E.2d at 183-84. The defendants raised the applicable statute of limitations, and one of the issues on appeal was whether the complaint adequately alleged fraudulent concealment sufficient to toll the statute of limitations. *Chicago Park District*, 78 Ill. 2d at 560, 402 N.E.2d at 184.

In holding that the complaint sufficiently pled fraudulent concealment, the court initially noted that silence ordinarily does not constitute fraudulent concealment, but when a person who is in a position of trust remains silent when he ought to speak, he can be found to have fraudulently concealed. *Chicago Park District*, 78 Ill. 2d at 562, 402 N.E.2d at 185.

57

The court stated that the alderman who took the bribe occupied a fiduciary relationship with the city. *Chicago Park District*, 78 Ill. 2d at 562, 402 N.E.2d at 185. The court further stated that according to the allegations in the complaint, "there was no apparent reason for the City to suspect that its fiduciary *** had entered into a scheme of bribery and fraud with the defendants until it became apparent during" the alderman's prosecution for failing to report bribes on his income taxes. *Chicago Park District*, 78 Ill. 2d at 562, 402 N.E.2d at 185. In ruling that the defendants could not utilize the statute of limitations to "protect their allegedly ill-gotten gains," the court stated, "To hold that the City was obliged to search for the misfeasance of its duly elected public official, absent a prior indication of wrongdoing, would require it to presume unfaithfulness on the part of its fiduciary." *Chicago Park District*, 78 Ill. 2d at 563-64, 402 N.E.2d at 185-86.

Likewise, in the present case, the jury was presented with evidence of a relationship of trust between the Diocese and Wisniewski, with Wisniewski placing his trust and confidence in the Diocese, its agents, and its employees. The evidence further supported a finding that Wisniewski had no reason to suspect that the Diocese, in fact, knew of Kownacki's history of abusing the Diocese's relationship of trust with its parishioners in order to commit child sexual abuse. When the Diocese learned of Wisniewski's sexual abuse, it remained silent, and Wisniewski had no reason to suspect that the Diocese betrayed his trust and confidence. Under these circumstances, we will not second-guess the jury's verdict.

The Diocese argues that even if there was a relationship of trust and confidence between it and Wisniewski, the fraudulent concealment statute did not relieve Wisniewski of the obligation to investigate the Diocese's wrongdoing. See *Dancor International, Ltd. v. Friedman, Goldberg & Mintz*, 288 Ill. App. 3d 666, 676, 681 N.E.2d 617, 624 (1997) (the fraudulent concealment statute does not apply to a party who, through the exercise of

58

ordinary diligence, could have discovered the concealed information). The Diocese notes that Wisniewski always remembered that the sexual abuse occurred, knew the identity of his abuser, and knew that his abuser was a priest of the Diocese. The Diocese concludes, therefore, that as a matter of law Wisniewski always had sufficient notice of his cause of action against it regardless of any fraudulent concealment by silence. We disagree.

"Whether the injured person has become possessed of sufficient information concerning his or her injury and its cause to put a reasonable person on inquiry to determine whether actionable conduct is involved is usually a question of fact." *Pruitt v. Schultz*, 235 Ill. App. 3d 934, 936, 601 N.E.2d 1372, 1374 (1992). In the present case, the jury found, based upon the evidence presented at the trial, that Wisniewski commenced his action within five years of the time he knew or should have known (1) that he sustained an injury and (2) that the injury was caused by the wrongful conduct of the Diocese. The factual issue of when Wisniewski is deemed to have discovered his injury was properly submitted to the jury, and for the reasons explained above, we believe that the evidence supports the jury's finding in Wisniewski's favor on that issue. We cannot say that only one conclusion could be drawn on undisputed facts; therefore, the question was "best left for [the jury]." *Pruitt*, 235 Ill. App. 3d at 936-37, 601 N.E.2d at 1375.

In support of its argument that Wisniewski had sufficient notice to prevent the application of the fraudulent concealment statute, the Diocese cites a number of cases from other jurisdictions, including *Doe v. Archdiocese of Cincinnati*, 2006–Ohio–2625, 849 N.E.2d 268, *Baselice v. Franciscan Friars Assumption BVM Province, Inc.*, 2005 PA Super. 246, 879 A.2d 270, and *Cevenini v. Archbishop of Washington*, 707 A.2d 768 (D.C. 1998).

In *Archdiocese of Cincinnati*, the plaintiff was a victim of child sexual abuse by a priest that occurred from 1980 through 1983. *Archdiocese of Cincinnati*, 2006–Ohio–2625, ¶3, 849 N.E.2d at 270-71. The plaintiff filed a lawsuit against the archdiocese in 2004 after

59

he learned that the priest had abused other victims. *Id*. at ¶5, 849 N.E.2d at 271. The plaintiff alleged that before he learned about the other victims, he had no reason to believe that the archdiocese had known about the priest's abuse. *Id*. at ¶4, 849 N.E.2d at 271. The court, however, noted that the plaintiff "knew the identity of his alleged perpetrator and knew the employer of his alleged perpetrator." *Id*. at ¶47, 849 N.E.2d at 279. Therefore, in holding that the plaintiff's claim was time-barred as a matter of law, the court stated that the plaintiff "had all of the facts necessary to investigate and prosecute his potential causes of action against the archdiocese." *Id*. at ¶47, 849 N.E.2d at 279.

Similarly, in *Baselice*, the court noted that the plaintiff "knew he was injured, knew the identity of the primary cause of his injury, and knew his abuser was an employee of the Archdiocese of Philadelphia, yet [the plaintiff] conducted no investigation into any *** aspect of the matter." *Baselice*, 2005 PA Super. 246, ¶19, 879 A.2d 270. The court concluded that, as a matter of law, "[t]hese facts alone were sufficient to put [the plaintiff] on notice that there was a possibility that the Archdiocese had been negligent." *Baselice*, 2005 PA Super. 246, ¶19, 879 A.2d 270.

In *Cevenini*, the plaintiffs were sexually abused by a priest when they were teenagers in the mid-1970s. *Cevenini*, 707 A.2d at 770. The plaintiffs filed a complaint against the archdiocese in 1995 after a newspaper published a series of articles disclosing that the archdiocese knew of the priest's pedophilic tendencies before he was assigned to the plaintiffs' church. *Cevenini*, 707 A.2d at 769. The plaintiffs maintained that they had no knowledge of the archdiocese's wrongdoing until the publication of the newspaper articles. *Cevenini*, 707 A.2d at 770. In holding that the claims were untimely as a matter of law, the *Cevenini* court stated the plaintiffs were aware that it was the archdiocese that assigned the priest to their church and that the priest was a "subordinate representative" of the archdiocese. *Cevenini*, 707 A.2d at 773. In addition, the abuse occurred on church premises

while the priest was functioning as a representative of the archdiocese. The court concluded that under these circumstances, "a reasonable plaintiff would have investigated his potential claims against the Archdiocese at the same time that his claims accrued against its representative." *Cevenini*, 707 A.2d at 773.

In the recent case of *Doe v. Catholic Bishop for the Diocese of Memphis*, 306 S.W.3d 712 (Tenn. Ct. App. 2008), the court analyzed similar cases from different jurisdictions, including *Archdiocese of Cincinnati* and *Cevenini*, and concluded that there were two views on this issue. The court cited *Archdiocese of Cincinnati* and *Cevenini* as examples of an "apparent majority" of courts that hold "as a matter of law that the plaintiff, in the exercise of reasonable diligence, would have discovered the defendant church's knowledge of the clergy member's prior acts of abuse, and that the plaintiff's lawsuit against the church is time-barred." *Catholic Bishop for the Diocese of Memphis*, 306 S.W.3d at 722. The court also stated that a "minority of courts" have held that "a fact issue exists as to whether the plaintiff, in the exercise of reasonable diligence, would have discovered the church's alleged knowledge of the prior sexual abuse." *Catholic Bishop for the Diocese of Memphis*, 306 S.W.3d at 722.

As an example of the "minority" cases, the *Catholic Bishop for the Diocese of Memphis* court cited *A.L.M. v. Diocese of Allentown*, 68 Pa. D. & C. 4th 111 (2004), and *Matthews v. Roman Catholic Diocese of Pittsburgh*, 67 Pa. D. & C. 4th 393 (2004). In *A.L.M.*, the plaintiffs alleged that they were sexually abused by priests when they were minors between 1965 and 1982. *A.L.M.*, 68 Pa. D. & C. 4th at 114-15. In 2004, they filed suit against the diocese and the bishop but not against the offending priests. *A.L.M.*, 68 Pa. D. & C. 4th at 114-15. The plaintiffs maintained that they were unable to discover that the diocese was a cause of their injuries until 2002 when representatives of the diocese disclosed that they had knowledge of prior incidents of child sexual abuse by the clergy members.

*A.L.M.*, 68 Pa. D. & C. 4th at 115. The plaintiffs' claims were not based on the vicarious liability of an employer. *A.L.M.*, 68 Pa. D. & C. 4th at 124.

The *A.L.M.* court held that there was a factual issue concerning when the plaintiffs knew or should have known that the defendants were a cause of their harm. *A.L.M.*, 68 Pa. D. & C. 4th at 124. The court stated, "Although the plaintiffs knew of their injuries and of the priests who abused them many years ago, if the plaintiffs' allegations are correct, a question remains as to when the plaintiffs knew or had reason to know that the defendants were also a cause of their harm." *A.L.M.*, 68 Pa. D. & C. 4th at 124. "Based on the allegations in the complaints, this did not occur until 2002, when disclosures by church officials alerted the plaintiffs to a conspiracy within the church to conceal sexual abuse against minors." *A.L.M.*, 68 Pa. D. & C. 4th at 125.

Similarly, in *Matthews*, the plaintiff alleged that he was sexually abused by a priest in 1989 when he was 12 years old. *Matthews*, 67 Pa. D. & C. 4th at 395. In 2004, he brought a lawsuit against his diocese after learning that the diocese had a policy of shielding and protecting priests engaged in child sexual abuse. *Matthews*, 67 Pa. D. & C. 4th at 395. He alleged that prior to that time, he had no reason to suspect that the diocese would have permitted the priest to continue to minister once the diocese discovered that the priest had a history of sexually molesting children. *Matthews*, 67 Pa. D. & C. 4th at 395. The court noted that the plaintiff's claims were not based on a theory of *respondeat superior*. *Matthews*, 67 Pa. D. & C. 4th at 395. Instead, the claims were based on allegations that, after the diocese had notice of complaints concerning the priest molesting other children, it allowed the priest to continue to serve at the plaintiff's church, ministering to minor parishioners. *Matthews*, 67 Pa. D. & C. 4th at 395-96.

The *Matthews* court held that a jury should decide the issue of when the plaintiff knew or should have known of his cause of action. *Matthews*, 67 Pa. D. & C. 4th at 407. The

62

court rejected *Cevenini*'s holding that, as a matter of a law, at the time of the abuse, a plaintiff should have reason to suspect that the diocese may also have independent responsibility for the abuse. The court did not find *Cevenini*'s rationale to be persuasive because "the employer is a church which the plaintiff attends and the employee is engaging in activity that may be reasonably viewed as conduct that the church could never tolerate." *Matthews*, 67 Pa. D. & C. 4th at 407. The *Matthews* court stated, "A jury may find that there is a loud ring of truth to plaintiff's statement that he and his family never approached Diocesan officials to ask whether they had knowingly assigned to their church, to work directly with the parishioners, including young boys, a priest with a history of sexually molesting children, because it would never cross their minds that the church would do so." *Matthews*, 67 Pa. D. & C. 4th at 407. The court emphasized that reasonable minds could differ and that the jury was not required to find that the plaintiff and his family should have considered the possibility that the diocese knowingly assigned a pedophile as their church's priest. *Matthews*, 67 Pa. D. & C. 4th at 407.

We find the reasoning in *A.L.M.* and *Matthews* to be persuasive under the facts of the present case. Similar to the facts in *A.L.M.* and *Matthews*, Wisniewski's claims against the Diocese were not based on *respondeat superior* but were based on the allegations that the Diocese knowingly installed a pedophile priest at the Salem parish. In addition, similar to *A.L.M.* and *Matthews*, the jury in the present case was entitled to find that Wisniewski had no reason to suspect that the Diocese intentionally assigned to the Salem parish a priest with a history of child sexual abuse.

As noted above, in *Chicago Park District*, the Illinois Supreme Court held that the City of Chicago had no reason to suspect that its fiduciary, a city alderman, "had entered into a scheme of bribery and fraud with the defendants" and that "[t]o hold that the City was obliged to search for misfeasance of its duly elected public official, absent a prior indication

63

of wrongdoing, would require it to presume unfaithfulness on the part of its fiduciary." *Chicago Park District*, 78 Ill. 2d at 562-63, 402 N.E.2d at 185. Likewise, in the present case, the evidence was sufficient for the jury to conclude that Wisniewski was under no obligation to search for wrongdoing by the Diocese when Kownacki was engaged in activities that may be reasonably viewed as conduct that the Diocese would never tolerate. The jury was entitled to find that Wisniewski was not required to presume such unfaithfulness on the part of the Diocese. Therefore, the trial court properly submitted the question of when Wisniewski is deemed to have discovered his claim to the jury as a factual issue, rather than deciding the issue in the Diocese's favor as a matter of law. See also *Turner v. Roman Catholic Diocese of Burlington, Vermont*, 2009 VT 101, ¶56, 987 A.2d 960 (the issue of whether the plaintiff was on inquiry notice of the diocese's potential liability of church leadership was an issue for the jury).

Furthermore, as noted above, there are two prongs of the factual analysis for when Wisniewski is deemed to have discovered his claim. With respect to the first prong of the definition instruction concerning when Wisniewski is deemed to have discovered his cause of action, the only evidence presented to the jury in the present case concerning when Wisniewski knew or should have known that he sustained an injury came from Dr. Peterson. The trial court in the present case would have erred if it had taken this factual decision away from the jury and decided the issue as a matter of law by granting the Diocese's motion for a judgment *n.o.v.*

The Diocese also cites *Clay v. Kuhl*, 189 Ill. 2d 603, 727 N.E.2d 217 (2000), and *Parks v. Kownacki*, 193 Ill. 2d 164, 737 N.E.2d 287 (2000), in support of its argument. We believe that *Clay* and *Parks* are distinguishable from the present case.

In *Clay*, the plaintiff was born in 1964, and she alleged that a clergyman began sexually abusing her in 1972 or 1973 and continued abusing her for seven years. *Clay*, 189

Ill. 2d at 605, 727 N.E.2d at 219. In January of 1996, the plaintiff filed a complaint against the clergyman and the religious order that had hired him. *Clay*, 189 Ill. 2d at 605, 727 N.E.2d at 219. Similar to the present case, the plaintiff in *Clay* alleged that the religious order had notice of similar misconduct committed by the clergyman but failed to take any steps to prevent the abuse she endured. *Clay*, 189 Ill. 2d at 605, 727 N.E.2d at 219. The supreme court held that, as a matter of law, the plaintiff's allegations were untimely. *Clay*, 189 Ill. 2d at 609-10, 727 N.E.2d at 221.

In *Clay*, the plaintiff's complaint alleged that the plaintiff's life was on a "tragic course" and that she did not realize that it was based, at least in part, on the abuse. *Clay*, 189 Ill. 2d at 609, 727 N.E.2d at 221. In ruling that the plaintiff's action was untimely as a matter of law, the court noted that the "plaintiff had sufficient information about her injury and its cause to require her to bring suit long before the date of discovery alleged in the complaint." *Clay*, 189 Ill. 2d at 610, 727 N.E.2d at 221. The court held that the plaintiff's alleged failure to fully discover the nature of her injuries was insufficient to delay the running of the limitations period. *Clay*, 189 Ill. 2d at 610, 727 N.E.2d at 222.

The *Clay* court distinguished the plaintiff's claim from tort actions arising from exposure to asbestos. *Clay*, 189 Ill. 2d at 612, 727 N.E.2d at 222. The court stated that there were "substantial distinctions between cases involving exposure to asbestos or other dangerous substances, in which the risk of harm is not immediately apparent, and cases involving events that give rise to an immediate awareness of injury." *Clay*, 189 Ill. 2d at 612, 727 N.E.2d at 222. The court concluded that in asbestos cases, " 'the plaintiffs did not discover that they suffered *any* injury until long after the tortious conduct occurred.' " (Emphasis in original.) *Clay*, 189 Ill. 2d at 612, 727 N.E.2d at 222 (quoting *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 367, 657 N.E.2d 894, 901 (1995)).

The facts of the present case are distinguishable from *Clay* because, in *Clay*, the

plaintiff alleged that she suffered from subsequent psychological problems as a result of the abuse but merely failed to realize a causal connection between the problems and the abuse. *Clay*, 189 Ill. 2d at 609-10, 727 N.E.2d at 221. In the present case, Wisniewski did not suffer any psychological problems until 2002. His life was not on a "tragic course" as was alleged in the complaint in *Clay*. Accordingly, the facts of the present case are more analogous to those cases noted by the *Clay* court in which the plaintiffs did not discover *any* injury until long after the tortious conduct occurred. The facts of the present case were certainly close enough for reasonable minds to differ. Furthermore, the *Clay* decision does not analyze any facts in that case relevant to the second prong of the determination of when a plaintiff is deemed to have discovered his claim. Under the second prong, for the reasons discussed above, there was sufficient evidence presented in the present case for the jury to determine the factual issue of when Wisniewski knew or should have known that the Diocese's wrongful conduct cased his injuries.

Accordingly, we find *Clay* to be distinguishable. A court of review "should not usurp the function of the jury and substitute its judgment on questions of fact fairly submitted, tried, and determined from the evidence which did not greatly preponderate either way." *Maple v. Gustafson*, 151 Ill. 2d 445, 452-53, 603 N.E.2d 508, 512 (1992). We cannot "reweigh the evidence and set aside a verdict merely because the jury could have drawn different inferences or conclusions, or because the court feels that other results are more reasonable." *Maple*, 151 Ill. 2d at 452, 603 N.E.2d at 512.

Likewise, *Parks* is distinguishable from the present case. In *Parks*, the plaintiff was the 14-year-old girl we described in the background section above, Gina, who was abused by Kownacki when he was the priest in St. Francisville and in Washington Park in the early 1970s. In 1995, Gina filed a lawsuit against Kownacki and the Diocese, and the defendants raised the statute of limitations and the statute of repose as a defense to Gina's claim. *Parks*,

193 Ill. 2d at 167, 737 N.E.2d at 289-90. The trial court dismissed Gina's complaint as untimely under both the statute of limitations and the statute of repose. *Parks*, 193 Ill. 2d at 167, 737 N.E.2d at 289-90.

In determining when the plaintiff knew or reasonably should have known that she sustained an injury, the *Parks* court noted as follows: "While she alleges that she did not know that the sexual relationship was wrong, it is clear from her actions–telling her parents, reporting Kownacki to [the bishop]–that she knew that Kownacki had wronged her." *Parks*, 193 Ill. 2d at 177, 737 N.E.2d at 294-95. The court stated, "Although plaintiff was not aware of her post[]traumatic stress disorder until recently, one particular injury that plaintiff claims, the forced abortion, obviously was apparent when plaintiff went to the hospital and was given dilation and curettage." *Parks*, 193 Ill. 2d at 177-78, 737 N.E.2d at 295.

In the present case, however, the only evidence presented at the trial concerning when Wisniewski discovered his injuries came from Dr. Peterson, who testified that Wisniewski did not begin suffering posttraumatic stress disorder until 2002. Unlike *Parks*, in the present case, there was no evidence that Wisniewski suffered from any physical injuries as a result of the abuse.

We do not believe that the *Clay* or *Parks* decisions allow us to set aside the jury's finding of fraudulent concealment in the present case. Under the facts presented at the trial, viewed in the light most favorable to Wisniewski, the jury could have concluded that the Diocese, through its officers, fraudulently concealed Wisniewski's claim against it by its silence, as defined under the second prong of the fraudulent concealment definition instruction. The jury was entitled to find that Wisniewski timely brought his cause of action against the Diocese within five years after discovering his cause of action in 2002. See 735 ILCS 5/13-215 (West 2008). We cannot conclude that "all of the evidence, when viewed in its aspect most favorable to [Wisniewski], so overwhelmingly favors [the Diocese] that no

67

contrary verdict based on that evidence could ever stand" (*Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967)). Accordingly, we must affirm the circuit court's denial of the Diocese's motion for a judgment *n.o.v.* on the issue of the Diocese's fraudulent concealment and the timeliness of Wisniewski's claim under the statute of repose.

## (2)

### Circuit Court's Finding of Equitable Estoppel and Equitable Tolling

When the circuit court denied the Diocese's motion for a summary judgment, it ruled that it would separately determine the factual issues relevant to the application of equitable estoppel and equitable tolling. See *Vaughn v. Speaker*, 126 Ill. 2d 150, 167, 533 N.E.2d 885, 892 (1988) ("the estoppel issue should be determined by a trier of fact other than the jury which may determine the merits of the negligence action" and "may be determined by the circuit court"). While the jury deliberated on the issues of fraudulent concealment, liability, and damages, the circuit court, "after considering all the testimony and evidence" and "assessing the credibility of witnesses," entered an order finding that Wisniewski's complaint was "not barred by the statute of limitations or statute of repose based on equitable estoppel and equitable tolling having been established by clear and convincing evidence." The circuit court found that Wisniewski proved equitable estoppel and equitable tolling by clear and convincing evidence. On appeal, the Diocese takes issue with these findings.

However, we have already determined that the jury properly decided the issue of fraudulent concealment. Equitable estoppel and equitable tolling are alternative theories for tolling the statute of repose. Therefore, we need not separately analyze the circuit court's finding of equitable estoppel and equitable tolling.

## (B)

### Statute of Limitations

Wisniewski raised the fraudulent concealment statute in response to the Diocese's affirmative defense under the applicable statute of limitations. The jury found in Wisniewski's favor on the issue of fraudulent concealment, and for the reasons we discussed above, we affirm the circuit court's denial of the Diocese's request for a judgment *n.o.v.* on the issue of fraudulent concealment.

As an alternative argument, the Diocese asserts that, under the statute of limitations and the common law discovery rule, Wisniewski's claim expired in 1981, two years after he turned 18. See 735 ILCS 5/13-211 (West 2008); *Clay*, 189 Ill. 2d at 607-08, 727 N.E.2d at 220-21. The Diocese argues, therefore, that the circuit court should have granted it a judgment *n.o.v.* on the statute of limitations issue. We disagree. We do not believe that the Diocese was entitled to a judgment in its favor as a matter of law under the applicable statute of limitations and the common law discovery rule.

In order to analyze the Diocese's argument that Wisniewski's claim was untimely under the statute of limitations, we must first determine which particular statute of limitations applies to Wisniewski's claim. We believe that the general statute of limitations applicable to personal injury claims and the common law discovery rule apply to Wisniewski's claim.

Prior to January 1, 1991, claims of personal injury resulting from childhood sexual abuse were governed by the general statute of limitations applicable to personal injury claims. *Clay v. Kuhl*, 189 Ill. 2d 603, 608, 727 N.E.2d 217, 220-21 (2000). On January 1, 1991, the legislature enacted a two-year statute of limitations for childhood sexual abuse cases that incorporated the common law "discovery rule." *Benton v. Vonnahmen*, 288 Ill. App. 3d 199, 206, 679 N.E.2d 1270, 1275 (1997) (section 13-202.2(b) "codifies [the] common law discovery rule"). Under its express terms, this statute of limitations does not begin to run until the victim "discovers or through the use of reasonable diligence should discover" that the abuse occurred and that the abuse caused the personal injury. Ill. Rev.

69

Stat. 1991, ch. 110, par. 13-202.2(b).

On July 24, 2003, the legislature lengthened the statute of limitations for childhood sexual abuse claims and expanded on the statute's discovery rule language. After the 2003 amendment, section 13-202.2(b) of the Code provided that actions for damages for personal injury based on childhood sexual abuse must be commenced within 10 years of the abused person's eighteenth birthday or "within 5 years of the date the person abused discovers or through the use of reasonable diligence should discover both (i) that the act of childhood sexual abuse occurred and (ii) that the injury was caused by the childhood sexual abuse." 735 ILCS 5/13-202.2(b) (West 2008).[4] Section 13-202.2(b) further states, "Knowledge of the abuse does not constitute discovery of the injury or the causal relationship between any later-discovered injury and the abuse." 735 ILCS 5/13-202.2(b) (West 2008).

In the present case, however, if the statute of limitations expired on Wisniewski's cause of action under the common law discovery rule, it did so in 1981, prior to the enactment of section 13-202.2(b) of the Code. Accordingly, in analyzing the timeliness of Wisniewski's claims under the relevant statute of limitations, we will apply the general statute of limitations applicable to personal injury claims and the common law discovery rule. See *Diocese of Dallas*, 234 Ill. 2d at 409, 917 N.E.2d at 484.

The supreme court has construed the common law discovery rule to activate the running of the statute of limitations when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. *Golla*, 167 Ill. 2d at 360-61, 657 N.E.2d at 898. The question of when the discovery rule activates the running of the statute of limitations is ordinarily a question of fact. *County of Du Page v. Graham, Anderson, Probst & White, Inc.*, 109 Ill. 2d 143, 153-54, 485 N.E.2d 1076, 1080

_____

[4] Section 13-202.2(b) was amended on January 1, 2011, to change 5 years to 20 years. Pub. Act 96-1093, §5, eff. Jan. 1, 2011.

70

(1985).

The statute of limitations and common law discovery issues are presented to us in the present case by way of the denial of a motion for a judgment *n.o.v.* As we noted above, in order to be entitled to a judgment *n.o.v.*, the movant has to establish that "all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors movant that no contrary verdict based on that evidence could ever stand." *Pedrick v. Peoria & Eastern R.R. Co.*, 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967). In the present case, the evidence was not so overwhelmingly in favor of the Diocese on the factual issues involving the statute of limitations and common law discovery rule that the jury's verdict cannot stand. Accordingly, we must affirm the circuit court's denial of the motion for a judgment *n.o.v.* on those factual issues.

In the present case, as noted above, the jury was asked to decide first whether Wisniewski brought his claim within five years of discovering his claim before it could consider the Diocese's liability and damages. The jury instructions further stated that Wisniewski is deemed to have discovered his claim when he knew or should have known that he sustained an injury and knew or should have known that his injury was caused by wrongful conduct by the Diocese. This definition instruction was identical to the definition of the common law discovery rule. See *Golla*, 167 Ill. 2d at 360-61, 657 N.E.2d at 898 (the effect of the common law discovery rule is to "postpone the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused"). The jury found that Wisniewski brought his claim within five years of discovering his claim as defined in the jury instructions. Wisniewski filed his claim against the Diocese in October 2002, and the only evidence Wisniewski presented concerning when he first learned of his injuries and of the Diocese's wrongful conduct was that he discovered them in 2002. Accordingly, by ruling

71

in his favor on the issue of fraudulent concealment, the jury must have found that Wisniewski filed his claim the same year he discovered his cause of action.

In support of its argument that it was entitled to a judgment as a matter of law under the statute of limitations, the Diocese cites *Parks* and *Clay*. For the reasons noted above, however, those cases are distinguishable from the facts of the present case. Unlike *Parks* and *Clay*, the only evidence presented to the jury in the present case was that Wisniewski was not aware of any injury as a result of the Diocese's wrongful conduct until 2002, the year he filed his claim. This evidence presented a question of fact for the jury to decide concerning the application of the common law discovery rule. Therefore, we must affirm the circuit court's denial of the Diocese's motion for a judgment *n.o.v.* on the statute of limitations issue.

## II.

## Legal Sufficiency of the Claims

The Diocese also argues that the circuit court should have granted its motion for a judgment *n.o.v.* because Wisniewski's claims against the Diocese were legally insufficient. The Diocese argues that it did not owe any duty to Wisniewski and, therefore, cannot be found to have breached any such duty. We disagree. The Diocese's argument that it did not owe any duty to Wisniewski is based on the following incorrect assertion in its brief: "Illinois courts have found that there is no duty or special relationship between a parishioner and his or her pastor, church, or church administration."

As noted above, courts have held that Illinois does not recognize a cause of action for "clergy malpractice" because those actions typically require the courts to interpret religious tenets and that analysis would violate the free exercise clause of the first amendment. However, Illinois allows judicial scrutiny of the actions of clergy that "[do] not implicate judicial assessment of the tenets of a particular religion or a determination of whether a particular litigant has adhered to those tenets." *Dausch*, 52 F.3d at 1433 (Ripple, J.,

72

concurring in part and dissenting in part). Under those circumstances, the sole inquiry is whether the individual has engaged in conduct that the state has deemed harmful. *Dausch*, 52 F.3d at 1433 (Ripple, J., concurring in part and dissenting in part). In other words, "[t]ort claims for behavior by a cleric that does not require the examination of religious doctrine are cognizable." *Dausch*, 52 F.3d at 1433 (Ripple, J., concurring in part and dissenting in part).

In the present case, the Diocese's assertion that it owed no duty to its Salem parishioners, including Wisniewski, under the facts of this case is entirely false. Wisniewski alleged and proved that the Diocese installed Kownacki as the priest of the parish in Salem at a time when it knew that Kownacki was a pedophile and had violently abused other minors at other parishes. The agents of the Diocese not only kept quiet about Kownacki's violent pedophile tendencies, but they expressly misrepresented to the Salem parishioners that Kownacki was suitable to minister to and have unsupervised contact with the children of the parish. The CEO of the Diocese, the bishop, directed the unknowing Salem parishioners to put their full faith and trust in Kownacki's piety, prudence, and character. It is without question that the State of Illinois deems such conduct as harmful, and neither the circuit court nor the jury was required to interpret Catholic religious doctrine to reach that conclusion. The first amendment simply does not shield the Diocese from liability for knowingly installing a child sexual abuser as a parish priest under the facts of this case.

In *Kigin v. Woodmen of the World Insurance Co.*, 185 Ill. App. 3d 400, 541 N.E.2d 735 (1989), a camp counselor sexually abused a 15-year-old camper at a youth camp. The camper filed suit against the camp operator who had employed the counselor and knew that the counselor had been intoxicated and had provided alcohol to the plaintiff. In analyzing the sufficiency of the plaintiff's complaint, the court stated that to allow the counselor, a 41-year-old man, " 'to be isolated with a 15-year-old girl at a remote location outside the presence of other sober adults' " "was a formula for disaster." *Kigin*, 185 Ill. App. 3d at 403,

541 N.E.2d at 737. The court held that the complaint sufficiently alleged that the camp operator knew or should have known of the need to exercise control over the counselor. *Kigin*, 185 Ill. App. 3d at 403, 541 N.E.2d at 737. The court stated that when the camp operator learned that the counselor had become intoxicated, plied the minor with alcohol, and had gone off alone into the woods with the minor at night, the camp operator then had a duty to take steps to protect the plaintiff. *Kigin*, 185 Ill. App. 3d at 403-04, 541 N.E.2d at 737.

Likewise, in the present case, the Diocese had knowledge of Kownacki's propensity to abuse minor children, plying them with alcohol prior to abusing them and telling them the abuse was a good thing. The Diocese placed Kownacki in the position to abuse Wisniewski in the same manner, and the Diocese facilitated and promoted Kownacki's abuse not only through silence but through affirmative acts of misrepresentation concerning Kownacki's character. Almost all the abuse Wisniewski described to the jury occurred on church property that Kownacki occupied solely because of his position as a priest of the Diocese. The opportunity for abuse created by the Diocese called for the exercise of control by the Diocese. Its failure to do so is unquestionably actionable in Illinois courts.

III.

Rule 215 Motion for Mental Examination

The Diocese argues that the trial court abused its discretion in denying its request to perform a mental examination of Wisniewski pursuant to Illinois Supreme Court Rule 215 (eff. July 1, 2002). The Diocese disclosed Dr. Moisy Shopper as its expert on June 16, 2008, and on June 24, 2008, it filed a motion for a mental examination of Wisniewski to be completed by Dr. Shopper. On July 3, 2008, the circuit court denied the Diocese's motion for a mental examination because the motion was "extremely untimely" and because the

74

Diocese did not provide the court with requested information in a timely fashion.

Rule 215(a) provides in part as follows:

"In any action in which the physical or mental condition of a party *** is in controversy, the court, upon notice and on motion made within a reasonable time before the trial, may order such party to submit to a physical or mental examination by a licensed professional in a discipline related to the physical or mental condition which is involved." Ill. S. Ct. R. 215(a) (eff. July 1, 2002).

"The purpose of the rule permitting the court to order a party to submit to physical or mental examination by a physician suggested by the party requesting examination is not to provide an expert witness for the litigant but to permit discovery." *Carlisle v. Harp*, 200 Ill. App. 3d 908, 913-14, 558 N.E.2d 318, 321 (1990). The circuit court has broad discretion in determining what is "a reasonable time before trial." *Carlisle*, 200 Ill. App. 3d at 913, 558 N.E.2d at 321. In the present case, we do not believe that the circuit court abused its discretion in ruling that the Diocese did not file its motion within a reasonable time before the trial.

Wisniewski filed his complaint on October 24, 2002, and from the very beginning, he alleged that he suffered "severe and permanent injuries or diseases to his psychological and psychiatric health." In February of 2008, the jury trial was scheduled to begin in August of 2008. The Diocese did not file the motion requesting a Rule 215 mental examination until June 24, 2008.

The circuit court conducted a hearing on the Diocese's motion on June 25, 2008. At the hearing, the circuit court noted that the motion was filed 50 days from the trial date, and the court indicated that it did not intend to continue the trial date because of the motion. At the hearing, the court gave the Diocese until June 27, 2008, to provide the court with information concerning how long its expert needed to conduct the examination, when the

examination would take place, when the expert would be able to give his written report, and when he would be available for a deposition. The Diocese, however, did not provide the trial court with any information until June 30, 2008, when the circuit court received a proposed outline of the mental examination, which was prepared by Dr. Shopper and which indicated that he wanted to conduct three two-hour sessions with Wisniewski in order to conduct his examination. The Diocese did not provide the other information the circuit court requested, including when the expert was available to conduct his examination, when he would have his report prepared, and when he would be available for a deposition.

On July 3, 2008, the circuit court denied the Diocese's motion for the mental examination. The court noted that there were only 46 days before the beginning of the jury trial and that the Diocese had not furnished the ordered information. On July 15, 2008, the Diocese filed a motion to reconsider the denial of its request for a mental examination. The trial court held a hearing on the motion to reconsider on July 21, 2008, four weeks prior to the trial, and denied the Diocese's motion to reconsider. The court stated at the hearing that the Diocese still had not furnished the information the court had requested. The court stated, "You can't expect a trial judge, forty[-]some days before trial, to grant [a mental examination] unless the trial judge knows *** when would the exam go forward, when would the written report be completed, and when would *** [the expert] be available for [the deposition]." The court noted that the jury trial was scheduled to begin in four weeks and that it could not grant the Diocese's motion without having the information it requested.

In *Ford v. Herman*, 316 Ill. App. 3d 726, 736, 737 N.E.2d 332, 341 (2000), the court affirmed a circuit court's denial of a Rule 215 motion for a medical examination when the motion was filed 68 days before the scheduled trial date. The court stated: "No dates were proposed for examinations and subsequent depositions. So the trial court could not know when those events would be completed." *Ford*, 316 Ill. App. 3d at 736, 737 N.E.2d at 341.

In the present case, for whatever reason, the Diocese chose not to provide the circuit court with the information it requested concerning when key events relevant to the examination would be completed. Under these circumstances, we will not find that the circuit court abused its discretion.

IV.

Evidentiary Rulings

The Diocese's final argument is that the circuit court abused its discretion in striking certain references from Kopacz's notes dated August 30, 2002, that he created after a therapy session with Wisniewski. In addition, the Diocese argues that the circuit court abused its discretion in limiting its cross-examination of two of Wisniewski's witnesses concerning the August 30, 2002, notes.

The admission of evidence and the scope of cross-examination are issues within the sound discretion of a trial court, and a reviewing court will not reverse rulings on those issues absent an abuse of discretion. *Snelson v. Kamm*, 204 Ill. 2d 1, 33, 787 N.E.2d 796, 814 (2003); *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 102, 658 N.E.2d 450, 459 (1995). In addition, an error in evidentiary rulings does not warrant a reversal unless the error was substantially prejudicial and affected the outcome of the trial. *Simmons v. Garces*, 198 Ill. 2d 541, 566-67, 763 N.E.2d 720, 736 (2002).

In the present case, on August 30, 2002, prior to Wisniewski filing his lawsuit in the present case, Kopacz had a therapy session with Wisniewski and prepared some notes concerning the therapy session. The notes referenced Wisniewski talking to Kopacz about his case against the Diocese. Wisniewski told Kopacz that his lawyer had sent a letter to the Diocese requesting a response, and he told Kopacz that he was not sure whether a court case would be viable.

At the trial, the Diocese attempted to first introduce this evidence during its cross-

examination of Wisniewski's expert witness, Dr. Peterson. Peterson testified that a part of his investigation included reviewing Kopacz's notes. During its cross-examination of Peterson, the Diocese asked Peterson the following: "In the August 30th, '02 notes of Dr. Kopacz, Dr. Kopacz's notes, quote, Not sure whether a court case would be viable or not, close quote, correct?" Wisniewski's attorney objected to this questioning, stating that it related to settlement negotiations that occurred in August of 2002. The circuit court sustained Wisniewski's objection but stated: "Clearly, you can't bring it up in front of a jury. I'll allow you to make an offer of proof outside the presence of the jury. But for right now, we're going to have to skip over it." The Diocese argued to the circuit court that the questioning did not involve settlement negotiations, and the court responded, "We'll go over it outside the presence of the jury, and after I hear what I hear, I'll let you know how I rule, but for right now, let's skip over it and go on." Later, during cross-examination of Peterson, the Diocese again asked Peterson about Kopacz's August 30, 2002, notes, asking whether the notes indicated that Wisniewski was not sure whether a court case would be viable. The court again sustained Wisniewski's objection to this testimony, stating that it had already directed the parties not to address this aspect of the notes because it referenced settlement discussions.

Wisniewski introduced Kopacz's testimony by way of an evidence deposition. Prior to the presentation of the deposition testimony, the circuit court struck a portion of the cross-examination of Kopacz that referred to the communication Wisniewski had with Kopacz on August 30, 2002, about the viability of the lawsuit. In striking the testimony, the court stated that the questioning improperly referred to settlement negotiations and that the questioning also involved an irrelevant legal opinion on the statute of limitations issue.

On appeal, the Diocese argues that the circuit court abused its discretion in preventing it from introducing evidence that on August 30, 2002, Wisniewski expressed concern during

78

therapy with Kopacz about the viability of a lawsuit. We agree with the circuit court that Wisniewski's expression of concern about the viability of his case against the Diocese was irrelevant and immaterial to the issues before the jury. Evidence is relevant if it has " 'any tendency to make the existence of any fact that is of consequence to the determination of the action more or less probable than it would be without the evidence.' " *DiCosola v. Bowman*, 342 Ill. App. 3d 530, 535, 794 N.E.2d 875, 879 (2003) (quoting *Wojcik v. City of Chicago*, 299 Ill. App. 3d 964, 971, 702 N.E.2d 303, 309 (1998)). The fact that a person untrained in the practice of law expresses concern over the viability of his or her legal claim is hardly remarkable and is of no consequence to any issue of material fact. Furthermore, the Diocese has not made a convincing case that the jury's verdict would have been different had this testimony been admitted. Accordingly, the judgment of the circuit court is affirmed.

CONCLUSION

For the foregoing reasons, we affirm the judgment of the circuit court of St. Clair County.


Affirmed.


JUSTICE SPOMER, dissenting:

I respectfully dissent. In so doing, I recognize that the equities in this case overwhelmingly favor the plaintiff and that the defendant's conduct was egregious and contributed to the harm that the plaintiff has suffered. However, my review of Illinois law as it applies to the facts of this case compels a conclusion that the plaintiff's claims were time-barred in 1991 when the plaintiff reached the age of 30. At that time, the statute of repose applicable to childhood sexual abuse cases was "12 years after the date on which the person abused attains the age of 18 years." Ill. Rev. Stat. 1991, ch. 110, par. 13-202.2(b).

79

As the Illinois Supreme Court has made clear, this statute of repose applies to claims arising from alleged misconduct of the Diocese to the same extent that it applies to the claims against the priest who perpetrated the abuse. *Doe A. v. Diocese of Dallas*, 234 Ill. 2d 393, 412-13 (2009). In addition, the due process clause of the Illinois Constitution prohibits claims that were once time-barred from being revived through the subsequent legislative action of the Illinois General Assembly that has since repealed the statute of repose. *Doe A.*, 234 Ill. 2d at 411-12.

Realizing this and in an attempt to toll the statute of repose, the plaintiff has raised the doctrines of fraudulent concealment, equitable tolling, and equitable estoppel. All three of these defenses to the statute of repose require that acts on the part of the defendant, or omissions, in the case of fraudulent concealment where a fiduciary or special relationship is shown, prevent the plaintiff from discovering his cause of action. See *Clay v. Kuhl*, 189 Ill. 2d 603, 613-14 (2000) (reciting the elements of fraudulent concealment and equitable tolling); see also *Orlak v. Loyola University Health System*, 228 Ill. 2d 1, 22 (2007) (equitable estoppel requires that the defendant's conduct or representations cause the plaintiff to delay filing suit). Whether or not the plaintiff can be said to have had a special relationship with the Diocese, I believe that Illinois law in effect at the time that the statute of repose expired prohibited a finding that acts or omissions by the Diocese prevented the plaintiff from discovering his claim. As further discussed below, Illinois law presumed an injury at the time the sexual abuse occurred, and, under Illinois law, the plaintiff had sufficient knowledge to investigate and prosecute potential claims against the defendant prior to the expiration of the statute of repose in 1991.

First, prior to the Illinois General Assembly's recent amendment to the statute of limitations, which provides that "[k]nowledge of the [childhood sexual] abuse does not constitute discovery of the injury or the causal relationship between any later-discovered

injury and the abuse" (735 ILCS 5/13-202.2(b) (West 2008)), the law in Illinois was quite the opposite. As recognized by the Illinois Supreme Court in *Clay*, prior to the aforementioned enactment, Illinois law presumed "an intent to harm and *a resulting injury*" from sexual abuse. (Emphasis added.) 189 Ill. 2d at 611. As in *Clay*, the plaintiff in the case at bar testified that he did not repress his memories of the sexual abuse. 189 Ill. 2d at 613. He always remembered that he was abused, that the abuse was harmful, that Kownacki was his abuser, and that Kownacki was a representative of the Diocese. Because Illinois law presumed some injury from childhood sexual abuse at the time of the occurrence, the misconduct of the Diocese in concealing its knowledge of Kownacki's abuse of other children, before, after, and including the plaintiff, could not have prevented the plaintiff from discovering that he was injured. The plaintiff might not have known the extent of his injuries at that time, but Illinois law presumed immediate injury from the act of the sexual abuse itself, and the plaintiff does not deny knowledge of the abuse. See *Clay*, 189 Ill. 2d at 613.

Second, although the plaintiff might not have had actual knowledge regarding the role the Diocese played in knowingly allowing Kownacki to be involved with children in the various parishes, he knew that Kownacki was a representative of the Diocese. Thus, he had sufficient knowledge of the possibility of negligence on the part of the Diocese to at least investigate its role. However, the plaintiff, at no time prior to 1991, undertook to investigate the role of the Diocese in Kownacki's sexual abuse of him. Had the plaintiff undertaken an investigation and inquired of the Diocese, by means of discovery or otherwise, as to its role, he might have uncovered the facts that give rise to his current causes of action. Having not done so, he cannot now establish that acts or omissions on the part of the Diocese prevented him from discovering the nature of the Diocese's misconduct prior to 1991.

Because the plaintiff cannot establish that the Diocese prevented him from discovering his causes of action prior to 1991, the plaintiff's causes of action were time-

barred at that time under the then-applicable statute of repose and cannot be revived without running afoul of the due process clause of the Illinois Constitution. See *Doe A*., 234 Ill. 2d at 411-12. For these reasons, I must conclude that the circuit court erred when it denied the defendant's motion for a summary judgment, when it denied the defendant's motion for a directed verdict, and when it denied the defendant's motion for a judgment notwithstanding the verdict.

NO. 5-08-0615

IN THE

APPELLATE COURT OF ILLINOIS

FIFTH DISTRICT

| | | |
|---|---|---|
| JAMES WISNIEWSKI, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | St. Clair County. |
| | ) | |
| v. | ) | No. 02-L-715 |
| | ) | |
| DIOCESE OF BELLEVILLE, | ) | Honorable |
| | ) | Lloyd A. Cueto, |
| Defendant-Appellant. | ) | Judge, presiding. |

**Opinion Filed**:  January 13, 2011

---

**Justices**:  Honorable Bruce D. Stewart, J.

Honorable Thomas M. Welch, J.,
Concurred in the judgment and opinion
Honorable Stephen L. Spomer, J.,
Dissented

---

**Attorneys for Appellant**  David Wells, Catherine A. Schroeder, Thompson Coburn LLP, One U.S. Bank Plaza, St. Louis, MO 63101

---

**Attorneys for Appellee**  J. Michael Weilmuenster, Stephen R. Wigginton, Frederick W. Keck, J. Brian Manion, Weilmuenster & Wigginton, P.C., 3201 West Main Street, Belleville, IL 62226; Philip J. Rarick, 1440 Spring Valley Road, Troy, IL 62294